Opinion
MOSK, J.
In this case, we consider a number of issues related to the validity of a mandatory employment arbitration agreement, i.e., an agreement by an employee to arbitrate wrongful termination or employment discrimination claims rather than filing suit in court, which an employer imposes on a prospective or current employee as a condition of employment. The employees in this case claim that employees may not be compelled to arbitrate antidiscrimination claims brought under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) We conclude that such claims are in fact arbitrable if the arbitration permits an employee to vindicate his or her statutory rights. As explained, in order for *91 such vindication to occur, the arbitration must meet certain minimum requirements, including neutrality of the arbitrator, the provision of adequate discovery, a written decision that will permit a limited form of judicial review, and limitations on the costs of arbitration.
The employees further claim that several provisions of the arbitration agreement are unconscionable, both because they fail to meet these minimum requirements and because the arbitration agreement is not bilateral. We conclude that the agreement possesses a damages limitation that is contrary to public policy, and that it is unconscionably unilateral.
Finally, the employees contend that the presence of these unconscionable provisions renders the entire arbitration agreement unenforceable. The employer argues that even if some of the provisions are unconscionable or contrary to public policy, the proper remedy is to strike or restrict those clauses pursuant to Civil Code section 1670.5, and to enforce the rest of the arbitration agreement. The trial court chose the employees’ preferred solution of refusing to enforce the arbitration agreement, biit the Court of Appeal sided with the employer and enforced the agreement minus the one provision it found unconscionable. We conclude, for reasons explained below, that the arbitration agreement is unenforceable and that therefore the Court of Appeal’s judgment must be reversed.
I. Statement of Facts and Procedural Issues
Marybeth Armendariz and Dolores Olague-Rodgers (hereafter the employees) filed a complaint for wrongful termination against their former employer, Foundation Health Psychcare Services, Inc. (hereafter the employer). The complaint and certain documents filed in support of the employer’s petition to compel arbitration provide us with the basic factual background of this case. In July and August of 1995, the employer hired the employees in the “Provider Relations Group” and they were later given supervisory positions with annual salaries of $38,000. On June 20, 1996, they were informed that their positions were being eliminated and that they were being terminated. During their year of employment, they claim that their supervisors and coworkers engaged in sexually based harassment and discrimination. The employees alleged that they were “terminated . . . because of their perceived and/or actual sexual orientation (heterosexual).”
Both employees had filled out and signed employment application forms, which included an arbitration clause pertaining to any future claim of wrongful termination. Later, they executed a separate employment arbitration agreement, containing the same arbitration clause. The clause states in *92 full: “I agree as a condition of my employment, that in the event my employment is terminated, and I contend that such termination was wrongful or otherwise in violation of the conditions of employment or was in violation of any express or implied condition, term or covenant of employment, whether founded in fact or in law, including but not limited to the covenant of good faith and fair dealing, or otherwise in violation of any of my rights, I and Employer agree to submit any such matter to binding arbitration pursuant to the provisions of title 9 of Part III of the California Code of Civil Procedure, commencing at section 1280 et seq. or any successor or replacement statutes. I and Employer further expressly agree that in any such arbitration, my exclusive remedies for violation of the terms, conditions or covenants of employment shall be limited to a sum equal to the wages I would have earned from the date of any discharge until the date of the arbitration award. I understand that I shall not be entitled to any other remedy, at law or in equity, including but not limited to reinstatement and/or injunctive relief.”
The employees’ complaint against the employer alleges a cause of action for violation of the FEHA[1] and three additional causes of action for wrongful termination based on tort and contract theories of recovery. The complaint sought general damages, punitive damages, injunctive relief, and the recovery of attorney fees and costs of suit.
The employer countered by filing a motion for an order to compel arbitration pursuant to Code of Civil Procedure section 1281.2. The parties submitted declarations in support of, and in opposition to, the motion. Relying on Stirlen v. Supercuts, Inc. (1997) 51 Cal.App.4th 1519 [60 Cal.Rptr.2d 138], the trial court denied the motion on the ground that the arbitration provision in question was an unconscionable contract. The trial court first found that the arbitration agreement was an “adhesion contract.” It also found that several of the provisions of the contract are “so one-sided as to ‘shock the conscience.’ ” In particular, it singled out the fact that only employees who file claims against an employer are required to arbitrate their claims, but not vice versa. Second, the agreement limits damages to back-pay, precluding damages available for statutory antidiscrimination claims and tort damages, such as punitive damages. The trial court also mentioned the supposed lack of discovery under the arbitration agreement. It concluded: “Given the overall unfairness of the provision,” this was not an appropriate case for striking the unlawful provisions of the arbitration agreement; instead it invalidated the entire agreement.
*93 After the employer filed a timely appeal, the Court of Appeal reversed. The court concluded that the contract was indeed one of adhesion and that the damages provision was unconscionable and contrary to public policy. But for reasons elaborated below, the Court of Appeal held, contrary to the trial court, that the rest of the arbitration agreement should be enforced. It also determined that because the agreement incorporated the California Arbitration Act (CAA), adequate discovery, pursuant to Code of Civil Procedure section 1283.05, was available.
We granted review.
II. Discussion
A. Arbitrability of FEHA Claims
The employees urge us to adopt the conclusion of the United States Court of Appeals for the Ninth Circuit in Duffield v. Robertson Stephens & Co. (9th Cir. 1998) 144 F.3d 1182 (Duffield), which held that the Civil Rights Act of 1991 (Pub.L. No. 102-166 (Nov. 21, 1991) 105 Stat. 1071, hereafter sometimes the 1991 Act) prohibits the enforcement of mandatory employment agreements to arbitrate claims under title VII of the Civil Rights Act of 1964 (Title VII) or equivalent state antidiscrimination statutes, such as the FEHA. Duffield involved a securities broker who sought to litigate Title VII and FEHA claims against her employer after alleged sexual discrimination and harassment, and who was subject to a mandatory arbitration agreement. The starting point for the Duffield court is the fact that the 1991 Act “was primarily designed to ‘overrule’ hostile Supreme Court decisions in order to make discrimination claims easier both to bring and to prove in federal courts . . . .” (Duffield, supra, 144 F.3d at p. 1189.) It is against this background that the court examined section 118 of the 1991 Act, which provides: “Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including . . . arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title.” (Pub.L. No. 102-166, § 118, reprinted in notes foil. 42 U.S.C. § 1981.) The Duffield court found the language “[wjhere appropriate and to the extent authorized by law” to be indicative of a congressional intent to outlaw compulsory arbitration of employee civil rights claims, despite the apparently proarbitration thrust of section 118. (Duffield, supra, 114 F.3d at p. 1195.) The court reasoned as follows: The term “[wjhere appropriate,” must be considered in the context of the statute as a whole, which provided “for a vast strengthening of employees’ rights” (Id. at p. 1191); “ ‘Where appropriate,’ as used in the Act, would appear to *94 mean where arbitration furthers the purpose and objective of the Act—by affording victims of discrimination an opportunity to present their claims in an alternative forum, a forum that they find desirable—not by forcing an unwanted forum upon them.” (Id. at p. 1194, italics omitted.)
Likewise, the Duffield court explained the phrase “to the extent authorized by law” in context: “As the Supreme Court has stated, we should ‘examine initially’ the statute ‘with an eye toward determining Congress’ perception of the law that it was shaping or reshaping.’ [Citation.] The overwhelming weight of the law at the time Congress drafted [section] 118, and it was reported out of the House Education and Labor Committee, was to the effect that compulsory agreements to arbitrate Title VII claims were unenforceable. In other words, such agreements were not ‘authorized by law.’ To the contrary, the law at that time prohibited employers from compelling employees to arbitrate Title VII claims pursuant to collective bargaining agreements, ‘in large part’ because of the Court’s recognition of the critical role that Congress envisioned for the independent federal judiciary in advancing Title VII’s societal goal. (See McDonald [v. West Branch (1984)] 466 U.S. [284,] 289, 104 S.Ct. 1799[, 1802-1803]; [Alexander v.] Gardner-Denver [Co.] [(1974)] 415 U.S. [36,] 56, 94 S.Ct. 1011[, 1023-1024].”[2] (Duffield, supra, 144 F.3d at p. 1194, italics omitted.) This reading of the statute is especially supported by the legislative history, particularly the report of the House Committee on Education and Labor (the House report), which stated of the bill that was to become the 1991 Act: “ ‘The Committee emphasizes . . . that the use of alternative dispute mechanisms is . . . intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the committee believes that any agreement to submit disputed issues to arbitration, whether in the context of collective bargaining or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court’s interpretation of Title VII in Alexander v. Gardner-Denver Co. . . . The Committee does not intend this section to be used *95 to preclude rights and remedies that would otherwise be available.’ H.R.Rep. No. 40(1) at 97.” (Duffield, supra, 144 F.3d at p. 1195, italics added by the Duffield court.)
Finally, the Duffield court reasoned that if the 1991 Act precluded the enforcement of mandatory employment arbitration agreements with respect to Title VII claims, the employee’s FEHA claims must also be exempted from mandatory arbitration. Becaúse “ ‘[pjarallel state anti-discrimination laws are explicitly made part of Title VII’s enforcement scheme,’ FEHA claims are arbitrable to the same extent as Title VII claims.” (Duffield, supra, 144 F.3d at p. 1187, fn. 3.) In support of this proposition, the Duffield court cited Kremer v. Chemical Construction Corp. (1982) 456 U.S. 461, 477-478 [102 S.Ct. 1883, 1894-1895, 72 L.Ed.2d 262], which held that because state antidiscrimination laws were intended by Congress to be part of the federal antidiscrimination enforcement scheme, a judgment under New York’s anti-employment-discrimination statute precludes parties from relitigating the same issues in a Title VII action.
As the employer points out, the Ninth Circuit stands alone in its interpretation of the 1991 Act. (See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith (1st Cir. 1999) 170 F.3d 1, 10 [specifically considering and rejecting Duffield's analysis]; Sens v. John Nuveen & Co., Inc. (3d Cir. 1998) 146 F.3d 175, 183 (Seus) [same]; Koveleskie v. SBC Capital Markets, Inc. (7th Cir. 1999) 167 F.3d 361, 365 [same].)
Aside from the fact that Duffield is a minority of one, we find its reasoning unpersuasive. First and foremost, it is difficult to believe that Congress would have chosen to ban mandatory employment arbitration by means of a clause that encourages the use of arbitration and has no explicit prohibitory language, when it could have simply and straightforwardly proscribed mandatory employment arbitration of Title VII claims. Second, the Dujfield court’s analysis of the phrase “to the extent authorized by law” would perhaps be credible but for the fact that, as the court acknowledged (Duffield, supra, 144 F.3d at p. 1189), the United States Supreme Court decided Gilmer, supra, 500 U.S. 20, shortly before the passage of the 1991 Act. Gilmer modified the Gardner-Denver decision referred to in the congressional legislative history quoted above. Gilmer held that an Age Discrimination in Employment Act (ADEA) claim was arbitrable under a preemployment arbitration agreement between the plaintiff, a securities broker, and the New York Stock Exchange, with which he was required by his employer to register. The Gilmer court, in distinguishing its decision from the Gardner-Denver line of cases, did not rely on the fact that the latter was a Title VII *96 case. Rather, the court emphasized that Gardner-Denver and its progeny were collective bargaining cases, and that there was “[a]n important concern [for] the tension between collective representation and individual statutory rights” that was not present outside the collective bargaining context. (Gilmer, supra, 500 U.S. at p. 35 [111 S.Ct. at p. 1657].) The court also noted that the scope of the collective bargaining agreements in the Gardner-Denver line of cases did not seem to encompass the arbitration of statutory claims, and that those cases “were not decided under the [Federal Arbitration Act], which . . . reflects a ‘liberal federal policy favoring arbitration agreements.’ ” (Ibid.)
The Gilmer court did not decide whether employment contracts are generally subject to the Federal Arbitration Act, as explained below, nor did it definitively rule on whether Title VII claims were arbitrable. But at the very least, it was not at all clear at the time the 1991 Act was enacted that mandatory arbitration of Title VII claims (outside of the collective bargaining context) was prohibited according to judicial interpretation of Title VII, and in fact the contrary appeared to be more likely the case. The fact that the authors of the House report may have believed that section 118 of the 1991 Act was intended to incorporate a broad reading of the Gardner-Denver line of cases to preclude mandatory employment arbitration agreements of all types does not negate the fact that at the time Congress passed the 1991 Act, Gilmer was the law. Congress must be presumed to have been aware of Gilmer when it used the phrase “to the extent authorized by law.”
Nor can the phrase “[w]here appropriate” bear the weight given to it by the Dujfield court. There is no reason to suppose that Congress believed mandatory arbitration agreements of civil rights claims to be inappropriate, provided that arbitration gives claimants the full opportunity to pursue such claims. Although the Gilmer court acknowledged that federal statutes may provide exceptions to the rule of arbitrability found in the FAA, it held that “ ‘questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.’ ” (Gilmer, supra, 500 U.S. at p. 26 [111 S.Ct. at p. 1652].) We cannot discern in the general phrase “[w]here appropriate and to the extent authorized by law” a specific congressional intent to ban mandatory employment arbitration agreements.
We therefore conclude that nothing in the 1991 Act prohibits mandatory employment arbitration agreements that encompass state and federal antidiscrimination claims.
B. The Applicability of the FAA and the CAA
The Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.) incorporates a strong federal policy of enforcing arbitration agreements, including *97 agreements to arbitrate statutory rights. (See Broughton v. Cigna Healthplans (1999) 21 Cal.4th 1066, 1074-1075 [90 Cal.Rptr.2d 334, 988 P.2d 67] (Broughton), and cases cited therein.) The employees claim, however, that employment contracts are not subject to the FAA. Their position is based on a reading of section 1 of the FAA, which, in defining the term “commerce,” provides that “nothing herein shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.” (9 U.S.C. § 1.) The employees contend that the language “engaged in foreign or interstate commerce” was intended to apply to all employees within the reach of the FAA. That is, section 1 effectively excludes all employment contracts because employees not engaged in interstate commerce would be beyond the legislative power of Congress and therefore beyond the FAA. This is essentially the position of the Ninth Circuit in Craft v, Campbell Soup Co. (9th Cir. 1998) 161 F.3d 1199. The Craft court, after reviewing the legislative history of section 1 of the FAA, and the academic literature, rejected the position of the majority of courts that the phrase “engaged in foreign or interstate commerce” signifies only those directly engaged in interstate commerce, such as workers involved in the transportation industry. (Craft, supra, 161 F.3d at pp. 1202-1205; see also Finkin, “Workers’ Contracts” Under the United States Arbitration Act: An Essay in Historical Clarification (1996) 17 Berkeley J. Emp. & Lab. L. 282.) Several courts have since disagreed with Craft and sided with what continues to be the majority rule. (See Koveleskie v. SBC Capital Markets, Inc., supra, 167 F.3d at pp. 363-364, and cases cited therein.)[3]
Whether the FAA applies to employment contracts presents a substantial question, but one we need not decide here. California law, like federal law, favors enforcement of valid arbitration agreements. (Broughton, supra, 21 Cal.4th at p. 1074.) As we have observed: “Two years after the FAA was enacted, this state adopted its first modem arbitration statute (Stats. 1927, ch. 225), declaring arbitration agreements to be irrevocable and enforceable in terms identical to those used in section 2 of the federal act, and since that time California courts and its Legislature have ‘consistently reflected a friendly policy toward the arbitration process.’ [Citation.] That policy was expanded and clarified in the current arbitration statute which was adopted *98 in 1961 (Stats. 1961, ch. 461, § 2 et seq.), and it continues to be the policy of this state.” (Keating v. Superior Court (1982) 31 Cal.3d 584, 601-602 [183 Cal.Rptr. 360, 645 P.2d 1192], disapproved on other grounds sub nom. Southland Corp. v. Keating (1984) 465 U.S. 1 [104 S.Ct. 852, 79 L.Ed.2d 1].) Thus, under both federal and California law, arbitration agreements are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation[4] of any contract. (9 U.S.C. § 2; see also, Code Civ. Proc., § 1281.) In other words, under California law, as under federal law, an arbitration agreement may only be invalidated for the same reasons as other contracts. Moreover, the CAA, unlike the FAA, contains no exemption for employment contracts.[5] Indeed, Code of Civil Procedure section Í280, subdivision (a), defines the term “agreement,” for purposes of the CAA, as including “agreements between employers and employees or between their respective representatives.”
There is, of course, one major difference between the FAA and the CAA. The former generally preempts state legislation that would restrict the enforcement of arbitration agreements (see Doctor’s Associates, Inc. v. Casarotto (1996) 517 U.S. 681, 687-688 [116 S.Ct. 1652, 1656-1657, 134 L.Ed.2d 902]), while the CAA obviously does not prevent our Legislature from selectively prohibiting arbitration in certain areas. But the statute in question in this case, the FEHA, contains no such prohibition. “The unsuitability of a statutory claim for arbitration turns on [legislative] intent, which can be discovered in the text of the statute in question, its legislative history or in an ' “inherent conflict” between arbitration and the [statute’s] underlying purposes.’ ” (Broughton, supra, 21 Cal.4th at p. 1075, first bracketed text added, quoting Gilmer, supra, 500 U.S. at p. 26 [111 S.Ct. at p. 1652].) We find nothing in the language or the legislative history of the FEHA that suggests it was intended to prohibit arbitration, and the employees cite us to none. To be sure, the FEHA provides critically important protections against discrimination. But the imperative to enforce such protections does not, as a general matter, inherently conflict with arbitration. Assuming an adequate arbitral forum, we agree with the Supreme Court that “[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights *99 afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.” (Mitsubishi Motors v. Soler Chrysler-Plymouth (1985) 473 U.S. 614, 628 [105 S.Ct. 3346, 3354, 87 L.Ed.2d 444] (Mitsubishi Motors).)[6]
In short, even assuming that the FAA does not apply to employment contracts, our inquiry into the enforceability of the arbitration agreement at issue in this case entails the same inquiry under the CAA as the FAA: Are there reasons, based on general contract law principles, for refusing to enforce the present arbitration agreement? In the present case, the answer turns on whether and to what extent the arbitration agreement was unconscionable or contrary to public policy, questions to which we now turn.[7]
C. Arbitration of FEHA Claims
The United States Supreme Court’s dictum that a party, in agreeing to arbitrate a statutory claim, “does not forgo the substantive rights afforded by the statute [but] only submits to their resolution in an arbitral. . . forum” (Mitsubishi Motors, supra, 473 U.S. at p. 628 [105 S.Ct. at p. 3354]) is as much prescriptive as it is descriptive. That is, it sets a standard by which arbitration agreements and practices are to be measured, and disallows forms *100 of arbitration that in fact compel claimants to forfeit certain substantive statutory rights.
Of course, certain statutory rights can be waived. (Bickel v. City of Piedmont (1997) 16 CalAth 1040, 1048-1049 [68 Cal.Rptr.2d 758, 946 P.2d 427], abrogated with regard to its construction of the Permit Streamlining Act [Stat. 1998, ch. 283, § 5].) But arbitration agreements that encompass unwaivable statutory rights must be subject to particular scrutiny. This unwaivability derives from two statutes that are themselves derived from public policy. First, Civil Code section 1668 states: “All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.” “Agreements whose object, directly or indirectly, is to exempt [their] parties from violation of the law are against public policy and may not be enforced.” (In re Marriage of Fell (1997) 55 Cal.App.4th 1058, 1065 [64 Cal.Rptr.2d 522].) Second, Civil Code section 3513 states, “Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement.” (See In re Marriage of Fell, supra, 55 Cal.App.4th at p. 1064; Bickel v. City of Piedmont, supra, 16 CalAth at pp. 1048-1049 [rights under statute may be waived by agreement when public benefit is incidental to the legislation’s primary purpose].)
There is no question that the statutory rights established by the FEHA are “for a public reason.” “The broad goal of the FEHA is set forth at [Government Code] section 12920, which states in pertinent part: ‘It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgement on account of race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, sex or age.’ ” (Rojo v. Kliger (1990) 52 Cal.3d 65, 72-73 [276 Cal.Rptr. 130, 801 P.2d 373].) As we stated in Rojo: “The public policy against sex discrimination and sexual harassment in employment, moreover, is plainly one that ‘inures to the benefit of the public at large rather than to a particular employer or employee.’ [Citation.] No extensive discussion is needed to establish the fundamental public interest in a workplace free from the pernicious influence of sexism. So long as it exists, we are all demeaned.” (Id. at p. 90, italics omitted; see also Stevenson v. Superior Court (1997) 16 Cal.4th 880, 897 [66 Cal.Rptr.2d 888, 941 P.2d 1157] [recognizing that the FEHA’s age discrimination provisions similarly incorporate fundamental public policy].) It is indisputable that an employment contract that required employees to waive their rights under the FEHA *101 to redress sexual harassment or discrimination would be contrary to public policy and unlawful.
In light of these principles, it is evident that an arbitration agreement cannot be made to serve as a vehicle for the waiver of statutory rights created by the FEHA. We suggested as much in our recent discussion of rights derived from the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.), which the Legislature had declared to be unwaivable. In determining that the attorney fees and cost-shifting provisions provided by that statute, which advanced the statute’s goals, should be implicitly incorporated into the arbitration agreement at issue, we stated that parties agreeing to arbitrate statutory claims must be deemed to “consent to abide by the substantive and remedial provisions of the statute. [Citation.] Otherwise, a party would not be able to fully ‘ “vindicate [his or her] statutory cause of action in the arbitral forum.” ’ ” (Broughton, supra, 21 Cal.4th at p. 1087, quoting Gilmer, supra, 500 U.S. at pp. 27-28 [111 S.Ct. at p. 1653].)
The employees argue that arbitration contains a number of shortcomings that will prevent the vindication of their rights under the FEHA. In determining whether arbitration is considered an adequate forum for securing an employee’s rights under FEHA, we begin with the extensive discussion of this question in Cole v. Bums Intern. Security Services (D.C. Cir. 1997) 105 F.3d 1465 [323 App.D.C. 133] {Cole), in the context of Title VII claims. In that case, the employee, a security guard, filed Title VII claims against his former employer alleging racial discrimination and harassment. He had signed an arbitration form committing himself to arbitrate such claims.
The court began its analysis by acknowledging the difficulties inherent in arbitrating employees’ statutory rights, difficulties not present in arbitrating disputes arising from employee rights under collective bargaining agreements. “The reasons for this hesitation to extend arbitral jurisprudence from the collective bargaining context are well-founded. The fundamental distinction between contractual rights, which are created, defined, and subject to modification by the same private parties participating in arbitration, and statutory rights, which are created, defined, and subject to modification only by Congress and the courts, suggests the need for a public, rather than private, mechanism of enforcement for statutory rights.” (Cole, supra, 105 F.3d at p. 1476.) Although Gilmer, supra, 500 U.S. 20, as discussed above, had held that statutory employment rights outside of the collective bargaining context are arbitrable, the Cole court recognized that Gilmer, both explicitly and implicitly, placed limits on the arbitration of such rights. “Obviously, Gilmer cannot be read as holding that an arbitration agreement *102 is enforceable no matter what rights it waives or what burdens it imposes. [Citation.] Such a holding would be fundamentally at odds with our understanding of the rights accorded to persons protected by public statutes like the ADEA and Title VII. The beneficiaries of public statutes are entitled to the rights and protections provided by the law.” (Cole, supra, 105 F.3d at p. 1482.)
The Cole court noted that “[i]n Gilmer, the employee raised four challenges to arbitration under the New York Stock Exchange Rules, claiming that arbitration impermissibly diminished his ability to effectively vindicate his statutory rights. First, Gilmer challenged the impartiality of the arbitrators. [Citation.] The Court rejected this challenge, finding that the NYSE Rules themselves provide protection against biased arbitrators and that judicial review under the FAA would allow the courts to set aside any decision in which there ‘was evident partiality or corruption in the arbitrators.’ [Citation.] Second, Gilmer objected that the limited discovery allowed in arbitration would unfairly hamper his ability to prove discrimination. [Citation.] Again, the Court rejected this claim, pointing out that the NYSE Rules provided for discovery and that agreements to arbitrate are desirable precisely because they trade the procedures of the federal courts for the simplicity, informality, and expedition of arbitration. [Citation.] Third, Gilmer objected that, because arbitrators do not always issue written awards, public knowledge of discrimination, appellate review, and the development of the law would be undermined by arbitration of his statutory claims. [Citation.] This claim too was rejected because, in fact, the NYSE Rules require that arbitration awards be in writing and allow public access to awards. [Citation.] Finally, Gilmer’s objection that arbitration did not provide for equitable relief was rejected because the NYSE Rules did not restrict the types of relief available.” (Cole, supra, 105 F.3d at pp. 1481-1482.)
Based on Gilmer, supra, 500 U.S. 20, and on the basic principle of nonwaivability of statutory civil rights in the workplace, the Cole court formulated five minimum requirements for the lawful arbitration of such rights pursuant to a mandatory employment arbitration agreement. Such an arbitration agreement is lawful if it “(1) provides for neutral arbitrators, (2) provides for more than minimal discovery, (3) requires a written award, (4) provides for all of the types of relief that would otherwise be available in court, and (5) does not require employees to pay either unreasonable costs or any arbitrators’ fees or expenses as a condition of access to the arbitration forum. Thus, an employee who is made to use arbitration as a condition of employment ‘effectively may vindicate [his or her] statutory cause of action in the arbitral forum.’ ” (Cole, supra, 105 F.3d at p. 1482, italics omitted.)
*103 Except for the neutral arbitrator requirement, which we have held is essential to ensuring the integrity of the arbitration process (Graham v. Scissor-Tail, Inc. (1981) 28 Cal.3d 807, 825 [171 Cal.Rptr. 604, 623 P.2d 165] (Scissor-Tail), and is not at issue in this case, the employees claim that the present arbitration agreement fails to measure up to the Cole requirements enumerated above. We consider below the validity of those requirements and whether they are met by the employer’s arbitration agreement.[8]
1. Limitation of Remedies
The principle that an arbitration agreement may not limit statutorily imposed remedies such as punitive damages and attorney fees appears to be undisputed. We suggested as much in Broughton when we held that an agreement to arbitrate a statutory claim implicitly incorporates “the substantive and remedial provisions of the statute” so that parties to the arbitration would be able to vindicate their “ ‘ “statutory cause of action in the arbitral forum.” ’ ” (Broughton, supra, 21 Cal.4th at p. 1087.) Similarly, in Graham Oil v. ARCO Products Co. (9th Cir. 1995) 43 F.3d 1244 (Graham Oil), the court refused to enforce an arbitration agreement between a petroleum franchiser and franchisee that did not allow for the punitive damages and attorney fees remedies available under the Petroleum Marketing Practices Act, because both of these remedies are “important to the effectuation of the PMPA’s policies.” (Gaham Oil, supra, 43 F.3d at p. 1248.)
As stated, the arbitration agreement in this case provides in part: “I and Employer further expressly agree that in any such arbitration, my exclusive remedies for violation of the terms, conditions or covenants of employment shall be limited to a sum equal to the wages I would have earned from the date of any discharge until the date of the arbitration award. I understand that I shall not be entitled to any other remedy, at law or in equity, including but not limited to reinstatement and/or injunctive relief.” (See ante, at p. 92.) The employees claim that the agreement compels them to arbitrate statutory claims without affording the full range of statutory remedies, including punitive damages and attorney fees to a prevailing plaintiff, available under *104 the FEHA. (See Commodore Home Systems Inc. v. Superior Court (1982) 32 Cal.3d 211, 221 [185 Cal.Rptr. 270, 649 P.2d 912]; Gov. Code, § 12965, subd. (b).)
The employer does not contest that the damages limitation would be unlawful if applied to statutory claims, but instead contends that the limitation applies only to contract claims, pointing to the language in the penultimate sentence that refers to “my exclusive remedy for violation of the terms, conditions or covenants of employment . . . .” Both the trial court and the Court of Appeal correctly rejected this interpretation. While the above quoted language is susceptible to the employer’s interpretation, the final sentence—“I understand that I shall not be entitled to any other remedy . . . .”—makes clear that the damages limitation was all-encompassing. We conclude this damages limitation is contrary to public policy and unlawful.
2. Adequate Discovery
The employees argue that employers typically have in their possession many of the documents relevant for bringing an employment discrimination case, as well as having in their employ many of the relevant witnesses. The denial of adequate discovery in arbitration proceedings leads to the de facto frustration of the employee’s statutory rights. They cite a report by the Department of Labor’s Commission on the Future of Worker-Management Relations, chaired by former Secretary of Labor John Dunlop and including employee and employer representatives, which concludes that “if private arbitration is to serve as a legitimate form of private enforcement of public employment law,” it must among other things provide “a fair and simple method by which the employee can secure the necessary information to present his or her claim.” (Com. on the Future of Worker-Management Relations, Report and Recommendations (1994) p. 31 (hereafter Dunlop Commission Report).)[9]
We agree that adequate discovery is indispensable for the vindication of FEHA claims. The employer does not dispute the point, but contends that the *105 arbitration agreement at issue in this case does provide for adequate discovery by incorporating by reference all the rules set forth in the CAA. Adequate provisions for discovery are set forth in the CAA at Code of Civil Procedure section 1283.05, subdivision (a).[10]
The employees point out that the provisions of Code of Civil Procedure section 1283.05 are only “conclusively deemed to be incorporated into” (Code Civ. Proc., § 1283.1, subd. (a)) an agreement to arbitrate under section 1283.1 if the dispute arises “out of . . . any injury to, or death of, a person caused by the wrongful act or neglect of another” (ibid.), and argues that this language does not apply to FEHA claims. They further argue that because adequate discovery is not guaranteed under the arbitration agreement, FEHA claims should not be deemed arbitrable.
We note that one Court of Appeal case has held that a FEHA sexual harassment claim is considered an “injury to ... a person” within the meaning of Code of Civil Procedure section 1283.1, subdivision (a). (Bihun v. AT&T Information Systems, Inc. (1993) 13 Cal.App.4th 976, 1005 [16 Cal.Rptr.2d 787], disapproved on other grounds in Lakin v. Watkins Associated Industries (1993) 6 Cal.4th 644, 664 [25 Cal.Rptr.2d 109, 863 P.2d 179]; but see Holmes v. General Dynamics Corp. (1993) 17 Cal.App.4th 1418, 1436-1437 [22 Cal.Rptr.2d 172] [contractual wrongful termination action held not to be a “personal injury” within the meaning of Civ. Code, § 3291].) The scope of this provision is not before us. But even assuming that the claim in this case is not the sort of injury encompassed by section 1283.1, subdivision (a), subdivision (b) of that section permits parties to agree to incorporate Code of Civil Procedure section 1283.05. We infer from subdivision (b), and from the fundamentally contractual nature of arbitration itself (see Vandenberg v. Superior Court (1999) 21 Cal.4th 815, 831 [88 Cal.Rptr.2d 366, 982 P.2d 229]), that parties incorporating the CAA into their arbitration agreement are also permitted to agree to something less than the full panoply of discovery provided in Code of Civil Procedure section *106 1283.05. We further infer that when parties agree to arbitrate statutory claims, they also implicitly agree, absent express language to the contrary, to such procedures as are necessary to vindicate that claim. (See Broughton, supra, 21 Cal.4th at pp. 1086-1087.) As discussed above, it is undisputed that some discovery is often necessary for vindicating a FEHA claim. Accordingly, whether or not the employees in this case are entitled to the full range of discovery provided in Code of Civil Procedure section 1283.05, they are at least entitled to discovery sufficient to adequately arbitrate their statutory claim, including access to essential documents and witnesses, as determined by the arbitrator(s) and subject to limited judicial review pursuant to Code of Civil Procedure section 1286.2.[11]
Therefore, although the employees are correct that they are entitled to sufficient discovery as a means of vindicating their sexual discrimination claims, we hold that the employer, by agreeing to arbitrate the FEHA claim, has already impliedly consented to such discovery. Therefore, lack of discovery is not grounds for holding a FEHA claim inarbitrable.
3. Written Arbitration Award and Judicial Review
The employees argue that lack of judicial review of arbitration awards makes the vindication of FEHA rights in arbitration illusory. They point to Moncharsh v. Heily & Blase (1992) 3 Cal.4th 1, 27-28 [10 Cal.Rptr.2d 183, 832 P.2d 899] (Moncharsh), in which we held that an arbitration award may not be vacated for errors of law on the face of the decision, even if these errors would cause substantial injustice. Arbitration, they argue, cannot be an adequate means of resolving a FEHA claim if the arbitrator is essentially free to disregard the law.
As the United States Supreme Court has stated: “[A]lthough judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute” at issue. (Shearson/American Express Inc. v. McMahon (1987) 482 U.S. 220, 232 [107 S.Ct. 2332, 2340, 96 L.Ed.2d 185] (McMahon).) In Moncharsh, we acknowledged that judicial review may be appropriate when “granting finality to an arbitrator’s decision would be inconsistent with the protection of a party’s statutory rights.” (Moncharsh, supra, 3 Cal.4th at p. 32; see also Board of Education v. Round Valley Teachers Assn. (1996) 13 Cal.4th 269, 276-277 [52 Cal.Rptr.2d 115, 914 P.2d 193].)
*107 We are not faced in this case with a petition to confirm an arbitration award, and therefore have no occasion to articulate precisely what standard of judicial review is “sufficient to ensure that arbitrators comply with the requirements of [a] statute.” (McMahon, supra, 482 U.S. at p. 232 [107 S.Ct. at p. 2340].) All we hold today is that in order for such judicial review to be successfully accomplished, an arbitrator in a FEHA case must issue a written arbitration decision that will reveal, however briefly, the essential findings and conclusions on which the award is based. While such written findings and conclusions are not required under the CAA (Code Civ. Proc., § 1283.4; Baldwin Co. v. Rainey Construction Co. (1991) 229 Cal.App.3d 1053, 1058, fn. 3 [280 Cal.Rptr. 499]), nothing in the present arbitration agreement precludes such written findings, and to the extent it applies to FEHA claims the agreement must be interpreted to provide for such findings. In all other respects, the employees’ claim that they are unable to vindicate their FEHA rights because of inadequate judicial review of an arbitration award is premature. (See Broughton, supra, 21 Cal.4th at p. 1086.)
4. Employee Not to Pay Unreasonable Costs and Arbitration Fees
The employees point to the fact that the agreement is governed by Code of Civil Procedure section 1284.2, which provides that “each party to the arbitration shall pay his pro rata share of the expenses and fees of the neutral arbitrator, together with other expenses of the arbitration incurred or approved by the neutral arbitrator . . . .” They argue that requiring them to share the often substantial costs of arbitrators and arbitration effectively prevents them from vindicating their FEHA rights.
In considering the employees’ claim, we start with the extensive discussion of this issue in Cole, supra, 105 F.3d at pages 1483-1485. The Cole court held that it was unlawful to require an employee who is the subject of a mandatory employment arbitration agreement to have to pay the costs of arbitration. The issue in that case was an arbitration agreement that was to be governed by the rules of the American Arbitration Association (AAA). Under these rules, the court noted that the employee may well be obliged to pay arbitrators’ fees ranging from $500 to $1,000 per day or more, a $500 filing fee, and administrative fees of $150 per day, in addition to room rental and court reporter fees. (Cole, supra, 105 F.3d at p. 1484 & fn. 12.) The court’s reasons for requiring employer-financed arbitration are worth quoting at length:
“[I]n Gilmer [supra, 500 U.S. 20], the Supreme Court endorsed a system of arbitration in which employees are not required to pay for the arbitrator *108 assigned to hear their statutory claims. There is no reason to think that the Court would have approved arbitration in the absence of this arrangement. Indeed, we are unaware of any situation in American jurisprudence in which a beneficiary of a federal statute has been required to pay for the services of the judge assigned to hear her or his case. Under Gilmer, arbitration is supposed to be a reasonable substitute for a judicial forum. Therefore, it would undermine Congress’s intent to prevent employees who are seeking to vindicate statutory rights from gaining access to a judicial forum and then require them to pay for the services of an arbitrator when they would never be required to pay for a judge in court.
“There is no doubt that parties appearing in federal court may be required to assume the cost of filing fees and other administrative expenses, so any reasonable costs of this sort that accompany arbitration are not problematic. However, if an employee like Cole is required to pay arbitrators’ fees ranging from $500 to $1,000 per day or more, ... in addition to administrative and attorney’s fees, is it likely that he will be able to pursue his statutory claims? We think not. See David W. Ewing, Justice On the Job: Resolving Grievances in the Nonunion Workplace (Harvard Business School Press 1989) at 291 (quoting corporate director of industrial relations at Northrop explaining why Northrop pays arbitrators’ fees: ‘[W]e bear the cost of the arbitration for the very practical reason that most of the employees who seek arbitration of their grievances simply couldn’t afford it if we did not.’). There is no indication in AAA’s rules that an arbitrator’s fees may be reduced or waived in cases of financial hardship. These fees would be prohibitively expensive for an employee like Cole, especially after being fired from his job, and it is unacceptable to require Cole to pay arbitrators’ fees, because such fees are unlike anything that he would have to pay to pursue his statutory claims in court.
“Arbitration will occur in this case only because it has been mandated by the employer as a condition of employment. Absent this requirement, the employee would be free to pursue his claims in court without having to pay for the services of a judge. In such a circumstance—where arbitration has been imposed by the employer and occurs only at the option of the employer—arbitrators’ fees should be borne solely by the employer.” (Cole, supra, 105 F.3d at pp. 1484-1485, fns. and italics omitted.)
The Tenth and Eleventh Circuit Courts of Appeals have adopted a position on arbitration fees for statutory employment claims essentially in accord with Cole. (Shankle v. B-G Maintenance Management of Colorado (10th Cir. 1999) 163 F.3d 1230, 1234-1235; Paladino v. Avnet Computer Technologies, *109 Inc. (11th Cir. 1998) 134 F.3d 1054, 1062 (conc. opn. of Cox, J., joined by Tjoflat, J.).) In Shankle, the court estimated that the employee would have to pay between $1,875 and $5,000 in forum costs to resolve his claim. As the court stated: “Mr. Shankle could not afford such a fee, and it is unlikely other similarly situated employees could either. The Agreement thus placed Mr. Shankle between the proverbial rock and a hard place—it prohibited use of the judicial forum, where a litigant is not required to pay for a judge’s services, and the prohibitive cost substantially limited use of the arbitral forum. [Citation.] Essentially, B-G Maintenance required Mr. Shankle to agree to mandatory arbitration as a term of continued employment, yet failed to provide an accessible forum in which he could resolve his statutory rights. Such a result clearly undermines the remedial and deterrent functions of the federal anti-discrimination laws.” (Shankle, supra, 163 F.3d at pp. 1234-1235.)
Although we have not addressed this issue, we quoted Cole, supra, 105 F.3d 1465, on this precise point in California Teachers Assn. v. State of California (1999) 20 Cal.4th 327, 355 [84 Cal.Rptr.2d 425, 975 P.2d 622] (California Teachers Assn.). We considered in that case whether it was constitutionally permissible to statutorily require a teacher who loses an administrative challenge to his dismissal to pay one-half of the administrative law judge’s fees. As we stated: “Although the court’s conclusion in Cole did not rest upon the requirements of procedural due process, the court was required to consider whether arbitration served as a reasonable substitute for a judicial forum. If employees in the private sector cannot be compelled to pay the cost of private arbitrators when seeking to vindicate statutory rights in the arbitral forum, then certainly public employees seeking to vindicate constitutionally based interests in an official quasi-judicial forum cannot be required to compensate the state for the cost of the administrative law judge. As in Cole, such fees would be unlike anything teachers would have to pay to protect their constitutional interests in court.” (Id. at p. 356.) Our holding in California Teachers Assn, serves to confirm the principle inherent in Cole that statutory or constitutional rights may be transgressed as much by the imposition of undue costs as by outright denial.
The employer argues that at least two federal circuit courts of appeals have not followed what it terms Cole's “preemptive approach” to the question of arbitration costs. In Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith Inc., supra, 170 F.3d 1 (Rosenberg), the court considered a challenge to an arbitration agreement encompassing Title VII claims, in which the New York Stock Exchange (NYSE) rules of arbitration were similar to those approved in Gilmer. Amici curiae for the employee argued that the NYSE *110 arbitration procedures were inadequate for Title VII claims because the arbitrators often refused to award statutory attorney fees and because of the possibility of charging forum fees as high as $3,000 per day. The court noted that it was not “the usual situation that a plaintiff is asked to bear forum fees” under the NYSE arbitration system, and that under NYSE rules “ ‘it is standard practice ... for employers to pay all of the arbitrators’ fees.’ ” (Rosenberg, supra, 170 F.3d at pp. 15-16.) The court further concluded that if unreasonable fees were imposed on the employees, this issue could be raised in a reviewing court after arbitration was completed. (Ibid.; accord, Koveleskie v. SBC Capital Markets, Inc., supra, 167 F.3d 361, 366; see also Williams v. Cigna Financial Advisors Inc. (5th Cir. 1999) 197 F.3d 752.)
The approaches of the courts in Cole, supra, 105 F.3d 1465, and Rosenberg, supra, 170 F.3d 1, are, for the most part, reconcilable. In Rosenberg, the arbitration system in question generally did not impose forum fees, and under those circumstances it was reasonable to conclude that imposition of costs that were inconsistent with statutory protections could be corrected through judicial review. We disagree with the employer that Rosenberg should be broadly interpreted to mean that the question of whether an employee is charged excessive forum fees should be decided only after arbitration has been completed. As we held in California Teachers Assn., it is not only the costs imposed on the claimant but the risk that the claimant may have to bear substantial costs that deters the exercise of the constitutional right of due process. (California Teachers Assn., supra, 20 Cal.4th at pp. 357-358.) So with the arbitration of statutory claims; if it is possible that the employee will be charged substantial forum costs, it is an insufficient judicial response to hold that he or she may be able to cancel these costs at the end of the process through judicial review. Such a system still poses a significant risk that employees will have to bear large costs to vindicate their statutory right against workplace discrimination, and therefore chills the exercise of that right. Because we conclude the imposition of substantial forum fees is contrary to public policy, and is therefore grounds for invalidating or revoking an arbitration agreement and denying a petition to compel arbitration under Code of Civil Procedure sections 1281 and 1281.2, we hold that the cost issues should be resolved not at the judicial review stage but when a court is petitioned to compel arbitration.
Accordingly, consistent with the majority of jurisdictions to consider this issue, we conclude that when an employer imposes mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process cannot generally require the employee to bear any type of expense that the employee would not be required to bear if he or she were free to *111 bring the action in court. This rule will ensure that employees bringing FEHA claims will not be deterred by costs greater than the usual costs incurred during litigation, costs that are essentially imposed on an employee by the employer.
Three principal objections have been raised to imposing the forum costs of arbitration on the employer. The first is that such a system will compromise the neutrality of the arbitrator. (Cole, supra, 105 F.3d at p. 1485.) As the Cole court recognized, however, it is not the fact that the employer may pay an arbitrator that is most likely to induce bias, but rather the fact that the employer is a “repeat player” in the arbitration system that is more likely to be a source of business for the arbitrator. (Ibid.) Furthermore, as the Cole court recognized, there are sufficient institutional safeguards, such as scrutiny by the plaintiff’s bar and appointing agencies like the AAA, to protect against corrupt arbitrators. (Ibid.)
The second objection is that although employees may have large forum costs, the cost of arbitration is generally smaller than litigation, so that the employee will realize a net benefit from arbitration. Although it is true that the costs of arbitration are on average smaller than those of litigation, it is also true that amount awarded is on average smaller as well. (See Schwartz, Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration, 1997 Wis. L.Rev. 33, 60-61 (Schwartz).) The payment of large, fixed, forum costs, especially in the face of expected meager awards, serves as a significant deterrent to the pursuit of FEHA claims.
To be sure, it would be ideal to devise a method by which the employee is put in exactly the same position in arbitration, costwise, as he or she would be in litigation. But the factors going into that calculus refuse to admit ready quantification. Turning a motion to compel arbitration into a mini-trial on the comparative costs and benefits of arbitration and litigation for a particular employee would not only be burdensome on the trial court and the parties, but would likely yield speculative answers. Nor would there be an advantage to apportioning arbitration costs at the conclusion of the arbitration rather than at the outset. Without clearly articulated guidelines, such a postarbitration apportionment would create a sense of risk and uncertainty among employees that could discourage the arbitration of meritorious claims.
Moreover, the above rule is fair, inasmuch as it places the cost of arbitration on the party that imposes it. Unlike the employee, the employer is *112 in a position to perform a cost/benefit calculus and decide whether arbitration is, overall, the most economical forum. Nor would this rule necessarily present an employer with a choice between paying all the forum costs of arbitration or forgoing arbitration altogether and defending itself in court. There is a third alternative. Because this proposed rule would only apply to mandatory predispute employment arbitration agreements, and because in many instances arbitration will be considered an efficient means of resolving a dispute both for the employer and the employee, the employer seeking to avoid both payment of all forum costs and litigation can attempt to negotiate postdispute arbitration agreements with its aggrieved employees.
The third objection to requiring the employer to shoulder most of the costs of arbitration is that it appears contrary to statute. As noted, Code of Civil Procedure section 1284.2 provides that unless the arbitration agreement provides otherwise, each party to the arbitration must pay his or her pro rata share of arbitration costs. But section 1284.2 is a default provision, and the agreement to arbitrate a statutory claim is implicitly an agreement to abide by the substantive remedial provisions of the statute. (Broughton, supra, 21 Cal.4th at pp. 1086-1087.) As noted, FEHA rights are unwaivable. Furthermore, under the FEHA, private civil actions by employees are the primary means of enforcing employees’ rights to be free of unlawful discrimination, once the Department of Fair Employment and Housing determines it will not file a complaint against the employer. (Gov. Code, § 12965, subd. (b).) The statute further provides that “[t]he superior, municipal, and justice courts of the State of California shall have jurisdiction of such actions.” (Ibid.) While we do not interpret this language providing access to courts as precluding arbitration of FEHA claims, or even the imposition of mandatory employment arbitration agreements, we do construe it as providing further support for the above stated principle that any such arbitration must be an adequate substitute for litigation. We do not believe the FEHA contemplates that employees may be compelled to resolve their antidiscrimination claims in a forum in which they must pay for what is the equivalent of the judge’s time and the rental of the courtroom.
Moreover, at the time the arbitration statute was enacted in 1927, and revised and reenacted in 1961, statutory employment discrimination claims were virtually nonexistent. There is little reason to believe that the Legislature that passed Code of Civil Procedure section 1284.2 contemplated a situation in which the intended beneficiary of such an antidiscrimination statute would be compelled to pay large arbitration costs as a condition of pursuing a discrimination claim. Thus, we construe the FEHA as implicitly *113 prohibiting such costs, a prohibition which the default provisions of section 1284.2 do not displace. (See Broughton, supra, 21 Cal.4th at p. 1087.)
We therefore hold that a mandatory employment arbitration agreement that contains within its scope the arbitration of FEHA claims impliedly obliges the employer to pay all types of costs that are unique to arbitration. Accordingly, we interpret the arbitration agreement in the present case as providing, consistent with the above, that the employer must bear the arbitration forum costs. The absence of specific provisions on arbitration costs would therefore not be grounds for denying the enforcement of an arbitration agreement. (See Cole, supra, 105 F.3d at pp. 1485-1486.)
D. Unconscionability of the Arbitration Agreement
1. General Principles of Unconscionability
In the previous part of this opinion, we focused on the minimum requirements for the arbitration of unwaivable statutory claims. In this part, we will consider objections to arbitration that apply more generally to any type of arbitration imposed on the employee by the employer as a condition of employment, regardless of the type of claim being arbitrated. These objections fall under the rubric of unconscionability.
We explained the judicially created doctrine of unconscionability in Scissor-Tail, supra, 28 Cal.3d 807. Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion. (Id. at pp. 817-819.) “The term [contract of adhesion] signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.” (Neal v. State Farm Ins. Cos. (1961) 188 Cal.App.2d 690, 694 [10 Cal.Rptr. 781].) If the contract is adhesive, the court must then determine whether “other factors are present which, under established legal rules—legislative or judicial—operate to render it [unenforceable].” (Scissor-Tail, supra, 28 Cal.3d at p. 820, fn. omitted.) “Generally speaking, there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or ‘adhering’ party will not be enforced against him. [Citations.] The second—a principle of equity applicable to all contracts generally—is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or ‘unconscionable.’ ” (Ibid.) Subsequent cases have referred to both the “reasonable expectations” and the “oppressive” limitations as being aspects of unconscionability. (A & M Produce Co. v. FMC Corp. (1982) 135 Cal.App.3d 473, 486-487 [186 Cal.Rptr. 114, 38 A.L.R.4th 1] (A & M Produce Co.).)
*114 In 1979, the Legislature enacted Civil Code section 1670.5, which codified the principle that a court can refuse to enforce an unconscionable provision in a contract. (Perdue v. Crocker National Bank (1985) 38 Cal.3d 913, 925 [216 Cal.Rptr. 345, 702 P.2d 503].) As section 1670.5, subdivision (a) states: “If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.” Because unconscionability is a reason for refusing to enforce contracts generally, it is also a valid reason for refusing to enforce an arbitration agreement under Code of Civil Procedure section 1281, which, as noted, provides that arbitration agreements are “valid, enforceable and irrevocable, save upon, such grounds as exist for the revocation of any contract.” The United States Supreme Court, in interpreting the same language found in section 2 of the FAA (9 U.S.C. § 2), recognized that “generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements . . . .” (Doctor’s Associates, Inc. v. Casarotto, supra, 517 U.S. 681, 687 [116 S.Ct. 1652, 1656], italics added.)
As explained in A & M Produce Co., supra, 135 Cal.App.3d 473, “unconscionability has both a ‘procedural’ and a ‘substantive’ element,” the former focusing on “ ‘oppression’ ” or “ ‘surprise’ ” due to unequal bargaining power, the latter on “ ‘overly harsh’ ” or “ ‘one-sided’ ” results. (Id. at pp. 486-487.) “The prevailing view is that [procedural and substantive unconscionability] must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.” (Stirlen v. Supercuts, Inc., supra, 51 Cal.App.4th at p. 1533 (Stirlen).) But they need not be present in the same degree. “Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.” (15 Williston on Contracts (3d ed. 1972) § 1763A, pp. 226-227; see also A & M Produce Co., supra, 135 Cal.App.3d at p. 487.) In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.
2. Unconscionability and Mandatory Employment Arbitration
Applying the above principles to this case, we first determine whether the arbitration agreement is adhesive. There is little dispute that it *115 is. It was imposed on employees as a condition of employment and there was no opportunity to negotiate.
Moreover, in the case of preemployment arbitration contracts, the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement. While arbitration may have its advantages in terms of greater expedition, informality, and lower cost, it also has, from the employee’s point of view, potential disadvantages: waiver of a right to a jury trial, limited discovery, and limited judicial review. Various studies show that arbitration is advantageous to employers not only because it reduces the costs of litigation, but also because it reduces the size of the award that an employee is likely to get, particularly if the employer is a “repeat player” in the arbitration system. (Bingham, Employment Arbitration: The Repeat Player Effect (1997) 1 Employee Rts. & Employment Poly. J. 189; Schwartz, supra, 1997 Wis. L.Rev. at pp. 60-61.) It is perhaps for this reason that it is almost invariably the employer who seeks to compel arbitration. (See Schwartz, supra, 1997 Wis. L.Rev. at pp. 60-63.)
Arbitration is favored in this state as a voluntary means of resolving disputes, and this voluntariness has been its bedrock justification. As we stated recently: “[P]olicies favoring the efficiency of private arbitration as a means of dispute resolution must sometimes yield to its fundamentally contractual nature, and to the attendant requirement that arbitration shall proceed as the parties themselves have agreed.” (Vandenberg v. Superior Court, supra, 21 Cal.4th at p. 831, italics omitted.) Given the lack of choice and the potential disadvantages that even a fair arbitration system can harbor for employees, we must be particularly attuned to claims that employers with superior bargaining power have imposed one-sided, substantively unconscionable terms as part of an arbitration agreement. “Private arbitration may resolve disputes faster and cheaper than judicial proceedings. Private arbitration, however, may also become an instrument of injustice imposed on a ‘take it or leave it’ basis. The courts must distinguish the former from the latter, to ensure that private arbitration systems resolve disputes not only with speed and economy but also with fairness.” (Engalla, supra, 15 Cal.4th at p. 989 (conc. opn. of Kennard, J.).) With this in mind, we turn to the employees’ specific unconscionability claims.
Aside from FEHA issues discussed in the previous part of this opinion, the employees contend that the agreement is substantively unconscionable because it requires only employees to arbitrate their wrongful termination *116 claims against the employer, but does not require the employer to arbitrate claims it may have against the employees. In asserting that this lack of mutuality is unconscionable, they rely primarily on the opinion of the Court of Appeal in Stirlen, supra, 51 Cal.App.4th 1519. The employee in that case was hired as a vice-president and chief financial officer; his employment contract provided for arbitration “ ‘in the event there is any dispute arising out of [the employee’s] employment with the Company,’ ” including “the termination of that employment.” (Stirlen, supra, 51 Cal.App.4th at p. 1528.) The agreement specifically excluded certain types of disputes from the scope of arbitration, including those relating to the protection of the employer’s intellectual and other property and the enforcement of a postemployment covenant not to compete, which were to be litigated in state or federal court. (Ibid.) The employee was to waive the right to challenge the jurisdiction of such a court. (Ibid.) The arbitration agreement further provided that the damages available would be limited to “ ‘the amount of actual damages for breach of contract, less any proper offset for mitigation of such damages.’ ” (Id. at p. 1529.) When an arbitration claim was filed, payments of any salary or benefits were to cease “ ‘without penalty to the Company,’ ” pending the outcome of the arbitration. (Id. at p. 1528.)
The Stirlen court concluded that the agreement was one of adhesion, even though the employee in question was a high-level executive, because of the lack of opportunity to negotiate. (Stirlen, supra, 51 Cal.App.4th at pp. 1533-1534.) The court then concluded that the arbitration agreement was substantively unconscionable. (Id. at p. 1541.) The court relied in part on Saika v. Gold (1996) 49 Cal.App.4th 1074 [56 Cal.Rptr.2d 922] (Saika)), in which the court had refused to enforce a provision in an arbitration agreement between a doctor and a patient that would allow a “trial de novo” if the arbitrator’s award was $25,000 or greater. The Saika court reasoned that such a clause was tantamount to making arbitration binding when the patient lost the arbitration but not binding if the patient won a significant money judgment. (Saika, supra, 49 Cal.App.4th at pp. 1079-1080.) Stirlen concluded that the Supercuts agreement lacked even the “modicum of bilaterality” that was present in Saika. (Stirlen, supra, 51 Cal.App.4th at p. 1541.) The employee pursuing claims against the employer had to bear not only with the inherent shortcomings of arbitration—limited discovery, limited judicial review, limited procedural protections—but also significant damage limitations imposed by the arbitration agreement. (Id. at pp. 1537-1540.) The employer, on the other hand, in pursuing its claims, was not subject to these disadvantageous limitations and had written into the agreement special advantages, such as a waiver of jurisdictional objections by the employee if sued by the employer. (Id. at pp. 1541-1542.)
*117 The Stirlen court did not hold that all lack of mutuality in a contract of adhesion was invalid. “We agree a contract can provide a ‘margin of safety’ that provides the party with superior bargaining strength a type of extra protection for which it has a legitimate commercial need without being unconscionable. [Citation.] However, unless the ‘business realities’ that create the special need for such an advantage are explained in the contract itself, which is not the case here, it must be factually established.” (Stirlen, supra, 51 Cal.App.4th at p. 1536.) The Stirlen court found no “business reality” to justify the lack of mutuality, concluding that the terms of the arbitration clause were “ ‘ “so extreme as to appear unconscionable according to the mores and business practices of the time and place.” ’ ” (Id. at p. 1542.)
The court in Kinney v. United Healthcare Services, Inc. (1999) 70 Cal.App.4th 1322 [83 Cal.Rptr.2d 348] (Kinney), came to the same conclusion with respect to an arbitration agreement to compel the employee, but not the employer, to submit claims to arbitration. As the Kinney court stated: “Faced with the issue of whether a unilateral obligation to arbitrate is unconscionable, we conclude that it is. The party who is required to submit his or her claims to arbitration [forgoes] the right, otherwise guaranteed by the federal and state Constitutions, to have those claims tried before a jury. (U.S. Const., Amend. VII; Cal. Const., art. I, § 16.) Further, except in extraordinary circumstances, that party has no avenue of review for an adverse decision, even if that decision is based on an error of fact or law that appears on the face of the ruling and results in substantial injustice to that party. [Citation.] By contrast, the party requiring the other to waive these rights retains all of the benefits and protections the right to a judicial forum provides. Given the basic and substantial nature of the rights at issue, we find that the unilateral obligation to arbitrate is itself so one-sided as to be substantively unconscionable.” (Kinney, supra, 70 Cal.App.4th at p. 1332.) The court also found that certain terms of the arbitration agreement—limits to discovery and caps on compensatory and punitive damages—“heightened” its unconscionability. (Ibid.)
We conclude that Stirlen and Kinney are correct in requiring this “modicum of bilaterality” in an arbitration agreement. Given the disadvantages that may exist for plaintiffs arbitrating disputes, it is unfairly one-sided for an employer with superior bargaining power to impose arbitration on the employee as plaintiff but not to accept such limitations when it seeks to prosecute a claim against the employee, without at least some reasonable justification for such one-sidedness based on “business realities.” As has been recognized “ ‘unconscionability turns not only on a “one-sided” result, *118 but also on an absence of “justification” for it.’ ” (A & M Produce Co., supra, 135 Cal.App.3d at p. 487.) If the arbitration system established by the employer is indeed fair, then the employer as well as the employee should be willing to submit claims to arbitration. Without reasonable justification for this lack of mutuality, arbitration appears less as a forum for neutral dispute resolution and more as a means of maximizing employer advantage. Arbitration was not intended for this purpose. (See Engalla, supra, 15 Cal.4th at p. 976.)
The employer cites a number of cases that have held that a lack of mutuality in an arbitration agreement does not render the contract illusory as long as the employer agrees to be bound by the arbitration of employment disputes. (Michalski v. Circuit City Stores, Inc. (7th Cir. 1999) 177 F.3d 634; Johnson v. Circuit City Stores (4th Cir. 1998) 148 F.3d 373, 378.) We agree that such lack of mutuality does not render the contract illusory, i.e., lacking in mutual consideration. We conclude, rather, that in the context of an arbitration agreement imposed by the employer on the employee, such a one-sided term is unconscionable. Although parties are free to contract for asymmetrical remedies and arbitration clauses of varying scope, Stirlen and Kinney are correct that the doctrine of unconscionability limits the extent to which a stronger party may, through a contract of adhesion, impose the arbitration forum on the weaker party without accepting that forum for itself.
A contrary conclusion was reached by the Alabama Supreme Court in Ex Parte McNaughton (Ala. 1998) 728 So.2d 592, 598-599. In that case, the employer required the employee to submit claims to arbitration, but expressly reserved for itself a choice of the arbitral or judicial forum. Two justices of the Alabama Supreme Court had stated in Northcom, Ltd. v. James (Ala. 1997) 694 So.2d 1329, 1338, that such arrangement would be invalid under Alabama’s “mutuality of remedy” doctrine as well as the doctrine of unconscionability. The McNaughton court repudiated that view. It criticized the Northcom dictum as singling out arbitration for disfavor: “Although the doctrine of unconscionability/mutuality of remedy purportedly could apply in the nonarbitration context, as suggested in the main opinion in Northcom, it directly depends on arbitration for its application: ‘The element of unconscionability in the context of an arbitration clause is supplied by the fact that, by agreeing to arbitrate, a party waives his right to “a remedy by due process of law” . . . and his “right of trial by jury” . . . .’ Northcom, 694 So.2d at 1338-39 (citations omitted). [Citation.] (‘[W]hile paying lip-service to the notion that [the doctrine of unconscionability/mutuality of remedy] “is equally true as to any unconscionable term of a contract of adhesion,” . . . the [lead opinion in Northcom] relies on the uniqueness of the concept of *119 arbitration under Alabama law to support the [doctrine].’) At bottom, this approach assigns a suspect status to arbitration agreements. Doing so flies in the face of Doctor’s Associates, 517 U.S. at 687, 116 S.Ct. 1652, where the Supreme Court of the United States explicitly stated that ‘[c]ourts may not . . . invalidate arbitration agreements under state laws applicable only to arbitration provisions.’ (Emphasis omitted.) Accordingly, we expressly reject the Northcom dictum regarding the doctrine of unconscionability/mutuality of remedy.” (McNaughton, supra, 728 So.2d at pp. 598-599, bracketed text in internal quote added in McNaughton.)
We disagree that enforcing “a modicum of bilaterality” in arbitration agreements singles out arbitration for suspect status. The Stirlen court correctly rejected a similar criticism: “Some California courts have been [loath] to apply the doctrine of unconscionability articulated in Scissor-Tail, supra, 28 Cal.3d 807 to arbitration agreements subject to the FAA on the ground that the opinion in that case ‘weav[es] together principles of adhesion contracts and state statutes governing the neutrality of arbitrators,’ and the United States Supreme Court has taught ‘that a court may not rely upon anything that is unique to an agreement to arbitrate when assessing unconscionability of an agreement governed by the FAA.’ (Heily v. Superior Court (1988) 202 Cal.App.3d 255, 260 [248 Cal.Rptr. 673].) However, while the form of unconscionability involved in Scissor-Tail related to arbitration—the nonneutrality of the arbitrator—the fundamental principles set forth by the Supreme Court in that case relate to unconscionability in general, not simply to arbitration agreements.” (Stirlen, supra, 51 Cal.App.4th at p. 1551.)
We agree with the Stirlen court that the ordinary principles of unconscionability may manifest themselves in forms peculiar to the arbitration context. One such form is an agreement requiring arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party. The application of this principle to arbitration does not disfavor arbitration. It is no disparagement of arbitration to acknowledge that it has, as noted, both advantages and disadvantages. The perceived advantages of the judicial forum for plaintiffs include the availability of discovery and the fact that courts and juries are viewed as more likely to adhere to the law and less likely than arbitrators to “split the difference” between the two sides, thereby lowering damages awards for plaintiffs. (See Haig, Corporate Counsel’s Guide: Legal Development Report on Cost-Effective Management of Corporate Litigation (1999) 610 PLI/Lit. 177, 186-187 [“a company that believes it has a strong legal and factual position may want to avoid arbitration, with its tendency to ‘split the difference,’ in favor of a judicial forum where it may be more likely to win a clear-cut victory”]; see also Schwartz, supra, 1997 *120 Wis. L.Rev. at pp. 64-65.) An employer may accordingly consider a court to be a forum superior to arbitration when it comes to vindicating its own contractual and statutory rights, or may consider it advantageous to have a choice of arbitration or litigation when determining how best to pursue a claim against an employee. It does not disfavor arbitration to hold that an employer may not impose a system of arbitration on an employee that seeks to maximize the advantages and minimize the disadvantages of arbitration for itself at the employee’s expense. On the contrary, a unilateral arbitration agreement imposed by the employer without reasonable justification reflects the very mistrust of arbitration that has been repudiated by the United States Supreme Court in Doctors’ Associates, Inc. v. Casarotto, supra, 517 U.S. 681, and other cases. We emphasize that if an employer does have reasonable justification for the arrangement—i.e., a justification grounded in something other than the employer’s desire to maximize its advantage based on the perceived superiority of the judicial forum—such an agreement would not be unconscionable. Without such justification, we must assume that it is.
Applying these principles to the present case, we note the arbitration agreement was limited in scope to employee claims regarding wrongful termination. Although it did not expressly authorize litigation of the employer’s claims against the employee, as was the case in Stirlen and Kinney, such was the clear implication of the agreement. Obviously, the lack of mutuality can be manifested as much by what the agreement does not provide as by what it does. (Cf. 24 Hour Fitness, Inc. v. Superior Court (1998) 66 Cal.App.4th 1199, 1205, 1212-1213 [78 Cal.Rptr.2d 533] [employee arbitration clause in personnel handbook found not to be unconscionable where it pertains to “ ‘any dispute aris[ing] from your employment’ ”].)
This is not to say that an arbitration clause must mandate the arbitration of all claims between employer and employee in order to avoid invalidation on grounds of unconscionability. Indeed, as the employer points out, the present arbitration agreement does not require arbitration of all conceivable claims that an employee might have against an employer, only wrongful termination claims. But an arbitration agreement imposed in an adhesive context lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence or series of transactions or occurrences. The arbitration agreement in this case lacks mutuality in this sense because it requires the arbitration of employee—but not employer—claims arising out of a wrongful termination. An employee terminated for stealing trade secrets, for example, must arbitrate his or her wrongful termination claim under the agreement while the employer has no corresponding obligation to arbitrate its trade secrets claim against the employee.
*121 The unconscionable one-sidedness of the arbitration agreement is compounded in this case by the fact that it does not permit the full recovery of damages for employees, while placing no such restriction on the employer. Even if the limitation on FEHA damages is severed as contrary to public policy, the arbitration clause in the present case still does not permit full recovery of ordinary contract damages. The arbitration agreement specifies that damages are to be limited to the amount of backpay lost up until the time of arbitration. This provision excludes damages for prospective future earnings, so-called front pay, a common and often substantial component of contractual damages in a wrongful termination case. (See 4 Wilcox, Cal. Employment Law (2000) § 60.08 [3][b], p. 60-102; id., § 60.08[2][b][iii], p. 60-97.) The employer, on the other hand, is bound by no comparable limitation should it pursue a claim against its employees.
The employer in this case, as well as the Court of Appeal, claim the lack of mutuality was based on the realities of the employees’ place in the organizational hierarchy. As the Court of Appeal stated: “We . . . observe that the wording of the agreement most likely resulted from the employees’ position within the organization and may reflect the fact that the parties did not foresee the possibility of any dispute arising from employment that was not initiated by the employee. Plaintiffs were lower-level supervisory employees, without the sort of access to proprietary information or control over corporate finances that might lead to an employer suit against them.”
The fact that it is unlikely an employer will bring claims against a particular type of employee is not, ultimately, a justification for a unilateral arbitration agreement. It provides no reason for categorically exempting employer claims, however rare, from mandatory arbitration. Although an employer may be able, in a future case, to justify a unilateral arbitration agreement, the employer in the present case has not done so.
E. Severability of Unconscionable Provisions
The employees contend that the presence of various unconscionable provisions or provisions contrary to public policy leads to the conclusion that the arbitration agreement as a whole cannot be enforced. The employer contends that, insofar as there are unconscionable provisions, they should be severed and the rest of the agreement enforced.
As noted, Civil Code section 1670.5, subdivision (a) provides that “[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without *122 the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.” Comment 2 of the Legislative Committee comment on section 1670.5, incorporating the comments from the Uniform Commercial Code, states: “Under this section the court, in its discretion, may refuse to enforce the contract as a whole if it is permeated by the unconscionability, or it may strike any single clause or group of clauses which are so tainted or which are contrary to the essential purpose of the agreement, or it may simply limit unconscionable clauses so as to avoid unconscionable results.” (Legis. Com. com., 9 West’s Ann. Civ. Code (1985 ed.) foll. § 1670.5, p. 494 (Legislative Committee comment).)
Thus, the statute appears to give a trial court some discretion as to whether to sever or restrict the unconscionable provision or whether to refuse to enforce the entire agreement. But it also appears to contemplate the latter course only when an agreement is “permeated” by unconscionability. We could discover no published cases in California that address directly the question of when a trial court abuses its discretion by refusing to enforce an entire agreement, as the trial court did in this case, nor precisely what it means for an agreement to be permeated by unconscionability. But there is a good deal of statutory and case law discussing the related question of when it is proper to sever illegal contract terms—a subject to which we will now turn.
Civil Code section 1598 states that “[w]here a contract has but a single object, and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void.” Civil Code section 1599 states that “[wjhere a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest.” In Keene v. Harling (1964) 61 Cal.2d 318, 320-321 [38 Cal.Rptr. 513, 392 P.2d 273] (Keene), we elaborated on those provisions: “ ‘Whether a contract is entire or separable depends upon its language and subject matter, and this question is one of construction to be determined by the court according to the intention of the parties. If the contract is divisible, the first part may stand, although the latter is illegal. [Citation.]’ [Citations.] It has long been the rule in this state that ‘ “When the transaction is of such a nature that the good part of the consideration can be separated from that which is bad, the Courts will make the distinction, for the . . . law . . . [divides] according to common reason; and having made that void that is against law, lets the rest stand.” ’ ” (Fn. omitted; see also Birbrower, Montalbano, Condon & Frank v. Superior Court (1998) 17 Cal.4th 119, 137-139 [70 Cal.Rptr.2d 304, 949 P.2d 1] (Birbrower) [holding severable legal from illegal portions of attorney fee agreement].)
*123 In Keene, the plaintiffs contended that a transaction to buy coin-operated machines should be voided in its entirety because a small number of those machines were illegal “ ‘bingo-type’ pinball machines.” (Keene, supra, 61 Cal.2d at p. 320.) Instead, we held that because the value of the illegal machines could be quantified, the legal and illegal consideration could be apportioned and the latter severed from the contract. (Id. at pp. 322-323.)
This was applied in Werner v. Knoll (1948) 89 Cal.App.2d 474, 476-477 [201 P.2d 45], to hold that the valid portion of an exculpatory damages provision in a landlord-tenant contract should be severed from the part that was invalid under Civil Code section 1668, and separately enforced. So, too, overbroad covenants not to compete may be restricted temporally and geographically. (See General Paint Corp. v. Seymour (1932) 124 Cal.App. 611, 614-615 [12 P.2d 990].) In out-of-state cases in jurisdictions in which covenants not to compete are more accepted legally,[12] such restrictions are common. (See, e.g., Central Adjustment Bureau, Inc. v. Ingram (Tenn. 1984) 678 S.W.2d 28, 37; Karlin v. Weinberg (1978) 77 N.J. 408 [390 A.2d 1161].)
The Keene court also cited several examples in which the illegality was not severable. (See Keene, supra, 61 Cal.2d at pp. 321-322.) In Mill and Lumber Co. v. Hayes (1888) 76 Cal. 387 [18 P. 391], the defendant agreed to sell the plaintiff 2,000,000 feet of lumber at a certain price and to refrain from selling to any other buyer. The court, in invalidating the agreement, stated: “The very essence and mainspring of the agreement—the illegal object—‘was to form a combination among all the manufacturers of lumber at or near Felton for the sole purpose of increasing the price of lumber, limiting the amount thereof to be manufactured, and give plaintiff control of all lumber manufactured,’ etc. [¶] This being the inducement to the agreement, and the sole object in view, it cannot be separated and leave any subject-matter capable of enforcement. . . . [¶] . . . [¶] The good cannot be separated from the bad, or rather the bad enters into and permeates the whole contract, so that none of it can be said to be good, and therefore the subject of an action.” (Id. at p. 393.) Similarly, in Teachout v. Bogy (1917) 175 Cal. 481 [166 P. 319], the court voided a contract for purchase of a lease, a liquor license, and the sale of a quantity of alcoholic beverages because sale of the license was both an integral part of the transaction and illegal. (Id. at p. 488.)
Two reasons for severing or restricting illegal terms rather than voiding the entire contract appear implicit in case law. The first is to prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement—particularly when there has been *124 full or partial performance of the contract. (See Keene, supra, 6 Cal.2d at pp. 320-321; Birbrower, supra, 17 Cal.4th at pp. 137-139; Saika, supra, 49 Cal.App.4th at p. 1082 [enforcing arbitration agreement already performed, while severing illegal trial de novo clause].) Second, more generally, the doctrine of severance attempts to conserve a contractual relationship if to do so would not be condoning an illegal scheme. (See e.g., Werner v. Knoll, supra, 89 Cal.App.2d at pp. 476-477; General Paint Corp. v. Seymour, supra, 124 Cal.App. at pp. 614-615.) The overarching inquiry is whether “ ‘the interests of justice . . . would be furthered’ ” by severance. (Benyon v. Garden Grove Medical Group (1980) 100 Cal.App.3d 698, 713 [161 Cal.Rptr. 146].) Moreover, courts must have the capacity to cure the unlawful contract through severance or restriction of the offending clause, which, as discussed below, is not invariably the case.
The basic principles of severability that emerge from Civil Code section 1599 and the case law of illegal contracts appear fully applicable to the doctrine of unconscionability. Courts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate. That Civil Code section 1670.5 follows this basic model is suggested by the Legislative Committee comment quoted above, which talks in terms of contracts not being enforced if “permeated” by unconscionability, and of clauses being severed if “so tainted or . . . contrary to the essential purpose of the agreement.” (Leg. Com. com., 9 West’s Ann Civ. Code, supra, foll. § 1670.5, p. 494.)
In this case, two factors weigh against severance of the unlawful provisions. First, the arbitration agreement contains more than one unlawful provision; it has both an unlawful damages provision and an unconscionably unilateral arbitration clause. Such multiple defects indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer’s advantage. In other words, given the multiple unlawful provisions, the trial court did not abuse its discretion in concluding that the arbitration agreement is permeated by an unlawful purpose. (See Graham Oil, supra, 43 F.3d at p. 124.)[13]
Second, in the case of the agreement’s lack of mutuality, such permeation is indicated by the fact that there is no single provision a court can strike or *125 restrict in order to remove the unconscionable taint from the agreement. Rather, the court would have to, in effect, reform the contract, not through severance or restriction, but by augmenting it with additional terms. Civil Code section 1670.5 does not authorize such reformation by augmentation, nor does the arbitration statute. Code of Civil Procedure section 1281.2 authorizes the court to refuse arbitration if grounds for revocation exist, not to reform the agreement to make it lawful. Nor do courts have any such power under their inherent limited authority to reform contracts. (See Kolani v. Gluska (1998) 64 Cal.App.4th 402, 407-408 [75 Cal.Rptr.2d 257] [power to reform limited to instances in which parties make mistakes, not to correct illegal provisions]; see also Getty v. Getty (1986) 187 Cal.App.3d 1159,1178-1179 [232 Cal.Rptr. 603].) Because a court is unable to cure this unconscionability through severance or restriction and is not permitted to cure it through reformation and augmentation, it must void the entire agreement. (See Stirlen, supra, 51 Cal.App.4th at p. 1552.)
Moreover, whether an employer is willing, now that the employment relationship has ended, to allow the arbitration provision to be mutually applicable, or to encompass the full range of remedies, does not change the fact that the arbitration agreement as written is unconscionable and contrary to public policy. Such a willingness “can be seen, at most, as an offer to modify the contract; an offer that was never accepted. No existing rule of contract law permits a party to resuscitate a legally defective contract merely by offering to change it.” (Stirlen, supra, 51 Cal.App.4th at pp. 1535-1536, fn. omitted.)
The approach described above is consistent with our holding in Scissor-Tail, supra, 28 Cal.3d at page 831. In that case, we found an arbitration *126 agreement to be unconscionable because the agreement provided for an arbitrator likely to be biased in favor of the party imposing the agreement. (Ibid.) We nonetheless recognized that “[t]he parties have indeed agreed to arbitrate” and that there is a “strong public policy of this state in favor of resolving disputes by arbitration.” (Ibid.) The court found a way out of this dilemma through the CAA, specifically Code of Civil Procedure section 1281.6, which provides in part: “If the arbitration agreement does not provide a method for appointing an arbitrator, the parties to the agreement who seek arbitration and against whom arbitration is sought may agree on a method of appointing an arbitrator and that method shall be followed. In the absence of an agreed method, or if the agreed method fails or for any reason cannot be followed, or when an arbitrator appointed fails to act and his or her successor has not been appointed, the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator.” Citing this provision, the court stated: “We therefore conclude that upon remand the trial court should afford the parties a reasonable opportunity to agree on a suitable arbitrator and, failing such agreement, the court should on petition of either party appoint the arbitrator.” (Scissor-Tail, supra, 28 Cal.3d at p. 831.) Other cases, both before and after Scissor-Tail, have also held that the part of an arbitration clause providing for a less-than-neutral arbitration forum is severable from the rest of the clause. (See Lewis v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (1986) 183 Cal.App.3d 1097, 1107 [228 Cal.Rptr. 345]; Richards v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (1976) 64 Cal.App.3d 899, 906 [135 Cal.Rptr. 26].)
Thus, in Scissor-Tail and the other cases cited above, the arbitration statute itself gave the court the power to reform an arbitration agreement with respect to the method of selecting arbitrators. There is no comparable provision in the arbitration statute that permits courts to reform an unconscionably one-sided agreement.
We further note that Scissor-Tail did not construe Civil Code section 1670.5, because the actions in the trial court in that case predated the enactment of that statute. (See Scissor-Tail, supra, 28 Cal.3d at p. 816.) Civil Code section 1670.5 makes clear what Scissor-Tail may have left ambiguous: that an arbitration agreement permeated by unconscionability, or one that contains unconscionable aspects that cannot be cured by severance, restriction, or duly authorized reformation, should not be enforced. Furthermore, although we have spoken of a “strong public policy of this state in favor of resolving disputes by arbitration” (Scissor-Tail, supra, 28 Cal.3d at p. 831), Code of Civil Procedure section 1281 makes clear that an arbitration agreement is to be rescinded on the same grounds as other contracts or *127 contract terms. In this respect, arbitration agreements are neither favored nor disfavored, but simply placed on an equal footing with other contracts.
The employer also points to two cases in which unconscionably one-sided provisions in arbitration agreements were severed and the agreement enforced. Saika, supra, 49 Cal.App.4th 1074, as discussed, involved an arbitration agreement with a provision that would make the arbitration nonbinding if the arbitration award were $25,000 or greater. In Benyon v. Garden Grove Medical Group, supra, 100 Cal.App.3d 698, 712-713, a provision of the arbitration agreement gave one party, but not the other, the option of rejecting the arbitrator’s decision. The courts in both instances concluded, in Saika implicitly, in Benyon explicitly, that the offending clause was sever-able from the rest of the arbitration agreement.
The provisions in these two cases are different from the one-sided arbitration provision at issue in this case in at least two important respects. First, the one-sidedness in the above two cases was confined to a single provision regarding the rights of the parties after an arbitration award was made, not a provision affecting the scope of the arbitration. As such, the unconscionability could be cured by severing the unlawful provision. Second, in both cases, the arguments against severance were made by the party that had imposed the unconscionable provision in order to prevent enforcement of an arbitration award against it, and the failure to sever would have had the effect of accomplishing the precise unlawful purpose of that provision—the invalidation of the arbitration award. As discussed, courts will generally sever illegal provisions and enforce a contract when nonenforcement will lead to an undeserved benefit or detriment to one of the parties that would not further the interests of justice. (See Benyon v. Garden Grove Medical Group, supra, 100 Cal.App.3d at p. 713.) In Benyon and Saika, the interests of justice would obviously not have been furthered by nonenforcement. The same considerations are not found in the present case.
III. Disposition
The judgment of the Court of Appeal upholding the employer’s petition to compel arbitration is reversed, and the cause is remanded to the Court of Appeal with directions to affirm the judgment of the trial court.
George, C. J., Kennard, J., Baxter, J., and Werdegar, J., concurred.

Same-sex harassment has been held to be unlawful under the FEHA. (Mogilefsky v. Superior Court (1993) 20 Cal.App.4th 1409, 1418 [26 Cal.Rptr.2d 116].)

Alexander v. Gardner-Denver Co., supra, 415 U.S. 36 (Gardner-Denver), to which the Duffield court referred, was summarized thus by the United States Supreme Court: “In Gardner-Denver, the issue was whether a discharged employee whose grievance had been arbitrated pursuant to an arbitration clause in a collective-bargaining agreement was precluded from subsequently bringing a Title VII action based upon the conduct that was the subject of the grievance. In holding that the employee was not foreclosed from bringing [a] Title VII claim, we stressed that an employee’s contractual rights under a collective-bargaining agreement are distinct from the employee’s statutory Title VII rights.” (Gilmer v. Interstate/JohnsonLane Corp. (1991) 500 U.S. 20, 33-34 [111 S.Ct. 1647, 1656, 114 L.Ed.2d 26] (Gilmer).) McDonald v. West Branch, supra, 466 U.S. 284, involved a similar statutory claim submitted to arbitration pursuant to a collective bargaining agreement, with a similar holding.

Gilmer did not address the issue of the applicability of the FAA to employment contracts, instead finding that Gilmer’s arbitration agreement was not contained in an employment contract but in his security broker’s registration application with the New York Stock Exchange, which falls outside the literal terms of section 1 of the FAA. (Gilmer, supra, 500 U.S. at p. 25, fn. 2 [111 S.Ct. at pp. 1651-1652].) We note that the United States Supreme Court has recently granted a writ of certiorari in Circuit City Stores, Inc. v. Adams (9th Cir. 2000) 194 F.3d 1070, certiorari granted May 22, 2000, 529 U.S. 1129 [120 S.Ct. 2004, 146 L.Ed.2d 955], apparently to address this question.

“As has been pointed out, the ‘revocation of a contract’ ... is something of a misnomer. ‘Offers are “revoked.” . . . Contracts are extinguished by rescission.’ ” (Engalla v. Permanente Medical Group, Inc. (1997) 15 Cal.4th 951, 973 [64 Cal.Rptr.2d 843, 938 P.2d 903] (Engalla).) We will refer throughout to the “rescission” or, simply, the “voiding” of an arbitration agreement.

Former Code of Civil Procedure section 1280 contained a provision exempting contracts pertaining to labor (Stats. 1927, ch. 225, § 1, p. 404), but this exemption was interpreted narrowly by courts and was omitted, pursuant to the California Law Revision Commission’s recommendation, from the 1961 statute. (See Recommendation and Study Relating to Arbitration (Dec. 1960) 3 Cal. Law Revision Com. Rep. (1961) pp. G-32 to G-34.)

Nothing in this opinion, however, should be interpreted as implying that an arbitration agreement can restrict an employee’s resort to the Department of Fair Employment and Housing, the administrative agency charged with prosecuting complaints made under the FEHA, or that the department would be prevented from carrying out its statutory functions by an arbitration agreement to which it is not a party. (See Gilmer, supra, 500 U.S. at p. 28 [111 S.Ct. atp. 1653] [employment arbitration agreement does not preclude employee’s complaint to the United States Equal Employment Opportunity Commission].)

The employees also argue that the arbitration agreements did not clearly put them on notice that they would be required to arbitrate statutory as well as contractual claims, and that they therefore did not knowingly waive the litigation of such claims. They point to the fact that the arbitration agreement refers principally to arbitration of wrongful termination claims “in violation of any express or implied condition, term or covenant of employment,” which appears to refer to contractual rights, and only makes mention of encompassing a termination “otherwise in violation of any of my rights.” (See ante, at p. 92.) The Ninth Circuit has held that an employee cannot be compelled to arbitrate a statutory antidiscrimination claim unless the arbitration agreement expressly puts the employees on notice that these claims are included. (Renteria v. Prudential Ins. Co. of America (9th Cir. 1997) 113 F.3d 1104.) Other courts have disagreed. (Seus, supra, 146 F.3d at pp. 183-184 & fn. 2; Patterson v. Tenet Healthcare Inc. (8th Cir. 1997) 113 F.3d 832, 838.) The question whether the arbitration agreement was sufficient to permit the employees to knowingly waive the right to a jury trial was not one of the issues on which the employees petitioned for review and is tangential to the principal claims on which we granted review. We decline to decide this issue. (See Cal. Rules of Court, rule 28(e)(2) [“Only the issues set forth in the petition [for review] and answer or fairly included in them need be considered by the court”].)

We emphasize at the outset that our general endorsement of the Cole requirements occurs in the particular context of mandatory employment arbitration agreements, in order to ensure that such agreements are not used as a means of effectively curtailing an employee’s FEHA rights. These requirements would generally not apply in situations in which an employer and an employee knowingly and voluntarily enter into an arbitration agreement after a dispute has arisen. In those cases, employees are free to determine what trade-offs between arbitral efficiency and formal procedural protections best safeguard their statutory rights. Absent such freely negotiated agreements, it is for the courts to ensure that the arbitration forum imposed on an employee is sufficient to vindicate his or her rights under the FEHA.

The Dunlop Commission Report, anticipating the safeguards prescribed by Cole, supra, 105 F.3d 1465, stated that “both employers and employees agree that if private arbitration is to serve as a legitimate form of private enforcement of public employment law, these systems must provide: [¶] a neutral arbitrator who knows the laws in question and understands the concerns of the parties; [¶] a fair and simple method by which the employee can secure the necessary information to present his or her claim; [¶] a fair method of cost-sharing between the employer and employee to ensure affordable access to the system for all employees; [¶] the right to independent representation if the employee wants it; [¶] a range of remedies equal to those available through litigation; [¶] a written opinion by the arbitrator explaining the rationale for the result; and [¶] sufficient judicial review to ensure that the result is consistent with the governing laws.” (Dunlop Com. Rep., supra, at pp. 30-31.)

Code of Civil Procedure section 1283.05, subdivision (a), states: “To the extent provided in Section 1283.1 depositions may be taken and discovery obtained in arbitration proceedings as follows: [¶] (a) After the appointment of the arbitrator or arbitrators, the parties to the arbitration shall have the right to take depositions and to obtain discovery regarding the subject matter of the arbitration, and, to that end, to use and exercise all of the same rights, remedies, and procedures, and be subject to all of the same duties, liabilities, and obligations in the arbitration with respect to the subject matter thereof, as provided in Chapter 2 (commencing with Section 1985) of, and Article 3 (commencing with Section 2016) of Chapter 3 of, Title 3 of Part 4 of this code, as if the subject matter of the arbitration were pending before a superior court of this state in a civil action other than a limited civil case, subject to the limitations as to depositions set forth in subdivision (e) of this section.” Subdivision (e) states that depositions may only be taken with the approval of the arbitrator.

We recognize, of course, that a limitation on discovery is one important component of the “simplicity, informality, and expedition of arbitration.” (Gilmer, supra, 500 U.S. at p. 31 [111 S.Ct. at p. 1655].) The arbitrator and reviewing court must balance this desirable simplicity with the requirements of the FEHA in determining the appropriate discovery, absent more specific statutory or contractual provisions.

Such covenants are largely illegal in this state. (Bus. & Prof. Code, § 16600.)

We need not decide whether the unlawful damages provision in this arbitration agreement, by itself, would be sufficient to warrant a court’s refusal to enforce that agreement. We note, however, that in the analogous case of overly broad covenants not to compete, courts have tended to invalidate rather than restrict such covenants when it appears they were drafted in bad faith, i.e., with a knowledge of their illegality. (See, e.g., Data Management, Inc. v. *125 Greene (Alaska 1988) 757 P.2d 62, 64-65; see also Farnsworth on Contracts (2d ed. 1988) § 5.8, p. 86, fn. 23, and cases cited therein.) The reason for this rule is that if such bad faith restrictive covenants are enforced, then “employers are encouraged to overreach; if the covenant they draft is overbroad then the court [will redraft] it for them.” (Data Management, Inc. v. Greene, supra, 757 P.2d at p. 65.) This reasoning applies with equal force to arbitration agreements that limit damages to be obtained from challenging the violation of unwaivable statutory rights. An employer will not be deterred from routinely inserting such a deliberately illegal clause into the arbitration agreements it mandates for its employees if it knows that the worst penalty for such illegality is the severance of the clause after the employee has litigated the matter. In that sense, the enforcement of a form arbitration agreement containing such a clause drafted in bad faith would be condoning, or at least not discouraging, an illegal scheme, and severance would be disfavored unless it were for some other reason in the interests of justice. (See Keene, supra, 61 Cal.2d at pp. 321-322.) The refusal to enforce such a clause is also consistent with the rule that a party may waive its right to arbitration through bad faith or willful misconduct. (Engalla, supra, 15 Cal.4th at p. 983.) Because we resolve this case on other grounds, we need not decide whether the state of the law with respect to damages limitations was sufficiently clear at the time the arbitration agreement was signed to lead to the conclusion that this damages clause was drafted in bad faith.