Filed 12/21/23; Certified for Publication 1/16/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| ALJARICE HASTY, | C097674 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CV-UWT-2021-0010217) |
| v. | |
| AMERICAN AUTOMOBILE ASSOCIATION OF NORTHERN CALIFORNIA, NEVADA & UTAH, | |
| Defendant and Appellant. | |

Plaintiff Aljarice Hasty sued defendant American Automobile Association of Northern California, Nevada & Utah (Association) for claims arising out of her employment. The Association filed a petition to compel arbitration and a motion to stay the action pursuant to an arbitration agreement that was signed as part of Hasty's employment contract (petition). The trial court found the arbitration agreement was unconscionable and exercised its discretion to decline severance of the unconscionable

1

terms. The Association appeals and argues the trial court erred in finding both procedural and substantive unconscionability and it abused its discretion by not severing any unconscionable terms.

We conclude the arbitration agreement was both procedurally and substantively unconscionable and the trial court did not abuse its discretion by declining to sever the unconscionable terms. We thus affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Hasty was employed by the Association as an insurance sales agent from March 4, 2019, to approximately mid-December 2020. In 2021, Hasty sued the Association for race discrimination, disability discrimination, retaliation in violation of Government Code section 12940, harassment, wrongful discharge, and retaliation in violation of Labor Code section 1102. The Association filed the petition to compel Hasty to bring her claims in arbitration. Hasty opposed the petition, arguing, among other things, that the arbitration agreement was unconscionable.

Pertinent to the unconscionability question, the Association submitted the declaration of Justina Lambert.[1] Lambert declared she is the vice president of people services at the Association and manages a team of human resources managers and directors. She authenticated various documents attached to her declaration, including the written employment offer the Association provided to Hasty, the arbitration agreement between the Association and Hasty, a portion of the Association's 2018 team member handbook, a portion of the Association's 2020 team member handbook, and a summary document from an electronic database, Workday, showing the documents Hasty electronically signed for purposes of employment. Lambert explained the Association

---

[1] The trial court also considered whether the Association carried its burden of establishing that there was a valid arbitration agreement between the parties and found it did. That determination is not challenged on appeal and we thus do not discuss it.

2

electronically disseminates certain employment documents via Workday and "Workday stores th[o]se documents in the worker documents file and tracks when employees receive, open, and electronically sign such documents."  Lambert declared the Association "has required all employees and prospective employees to enter into mutual agreements to arbitrate any and all claims arising from their employment or the termination thereof," and Hasty "was required to sign an arbitration agreement in the form of [the exhibit attached to Lambert's declaration] when she began work for [the Association] in March 2019."

The Association's written employment offer to Hasty included a clause providing that, "as a condition of [her] employment, [she] must accept the terms of the [Association's] [a]rbitration [a]greement and [c]onfidentiality [a]greement," which she "w[ould] be required to sign . . . on [her] first day of employment."  The Workday summary shows Hasty signed a number of documents, including an arbitration agreement, electronically.

The arbitration agreement attached to Lambert's declaration consists of two letter-size pages.  The document heading is set forth in a larger font size than the text in the remainder of the agreement and is capitalized and boldfaced, "**ARBITRATION AGREEMENT**."  The body of the agreement consists of seven single-spaced paragraphs in a smaller font size and possibly a different typeface.  It is unclear what typeface or font size was used in the document.  The agreement provides the Association and employee "agree that any and all disputes, claims, or causes of action, in law or equity, arising from or relating to [e]mployee's employment or the termination of [e]mployee's employment, including but not limited to statutory, contractual and other claims (including, without limitation, claims under the Age Discrimination in Employment Act; Title VII of the Civil Rights Act of 1964; [s]ection[s] 1981 through 1988 of Title 42 of the United States Code; the Americans with Disabilities Act; The Fair Labor Standard Act; The Family and Medical Leave Act; any state anti-discrimination statutes; wage and hours laws; equal

3

pay laws; any other federal, state or local civil or human rights law or any other local, state or federal law, regulation or ordinance; or any public policy, contract, tort or common law), shall be resolved to the fullest extent permitted by law, by final, binding, and confidential arbitration conducted before a JAMS arbitrator; provided, however, that if any employee benefit plan in which the [e]mployee participates provides a process for the resolution of disputed claims under such employee benefit plan, then such process will govern such claims and this arbitration agreement ('Agreement') will not apply to such claims.

"This Agreement waives the parties' rights to obtain any legal or equitable relief (e.g., monetary, injunctive or reinstatement) through any court. The parties also waive their right to commence any court action to the extent that is permissible under law provided that either party may seek equitable relief to preserve the status quo pending final disposition of the arbitration. **Both [e]mployee and [the Association] hereby waive the right to resolve any claim through a trial by jury or judge or by administrative proceeding**. The parties may seek and be awarded any remedy in arbitration that they could receive in a court of law. Nothing in this Agreement precludes either party from filing a charge or complaint with appropriate governmental administrative agencies and to assist or cooperate with agencies in their investigation or prosecution of charges or complaints, although, to the extent that is permissible by law, the parties waive their right to any remedy or relief as a result of such charges or complaints brought by such governmental administrative agencies.

"The arbitration shall take place in San Francisco, California for [e]mployee if he/she performs work for [the Association] in California, otherwise the arbitration shall take place in the state where the [e]mployee performs the majority of his/her work for [the Association], as determined by the arbitrator; provided, however, that if the arbitrator determines there will be an undue hardship to [e]mployee to have the arbitration in such location, the arbitrator will choose an alternative appropriate location. The arbitration

4

shall be conducted in accordance with the applicable employment rules of JAMS then in effect (except to the extent such rules conflict with this Agreement, in which case the terms of this Agreement will control) and the requirements of California law and the Federal Arbitration Act (9 U.S.C., [s]ections 1-14) regarding the terms and enforcement of arbitration agreements. (The JAMS [e]mployment [a]rbitration [r]ules and [p]rocedures are available for review on JAMS's web site at http://www.jamsadr.com/rules- employment-arbitration.) All claims, disputes or causes of action under this Agreement, whether by [the Association] or [e]mployee, must be brought in an individual capacity, and shall not be brought as a plaintiff (or claimant) or class member in any purported class or representative proceeding, nor brought in a private attorney general capacity or proceeding, nor joined or consolidated with any claims of any other person or entity. Employee will have the right to be represented by legal counsel at any arbitration proceeding. The arbitrator shall: (1) have the authority to compel adequate discovery for the resolution of the dispute and to award such relief as would otherwise be permitted by law; and (2) issue a written arbitration decision including the arbitrator's essential findings and conclusions and a statement of the award. The arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding. [The Association] shall pay all of the arbitrator's fees and administrative fees in excess of the amount of filing and other court-related fees [e]mployee would have been required to pay if the claims were asserted in a court of law. Employee and [the Association] acknowledge that, by agreeing to this arbitration procedure, both [e]mployee and [the Association] waive the right to resolve any such dispute through a trial by jury or judge or by administrative proceeding. Nothing in this Agreement is intended to prevent [e]mployee or [the Association] from obtaining injunctive relief in court if the award [that] such party might obtain in arbitration may be rendered ineffectual without provisional relief.

5

"This Agreement is made under the provisions of the Federal Arbitration Act (9 U.S.C., [s]ection 1-14) and will be construed and governed accordingly. Questions of arbitrability (i.e. whether an issue is subject to arbitration) shall be decided by the arbitrator. Likewise, procedural questions which grow out of the dispute and bear on its final disposition are also matters for the arbitrator.

"If any term or provision of this Agreement is declared illegal or unenforceable and cannot be modified to be enforceable, such term or provision shall immediately become null and void, leaving the remainder of this Agreement in full force and effect.

"The terms of this Agreement cannot be orally modified. This Agreement may not be modified except in a writing signed by both the [e]xecutive [v]ice [p]resident, [c]hief [f]inancial [o]fficer of [the Association] and [e]mployee.

"The parties understand and agree that this Agreement contains adequate consideration, the receipt and sufficiency of which is hereby acknowledged. Employee has been advised of his/her rights to consult with an attorney of his/her choice regarding this Agreement."

At the end of the arbitration agreement, the document provides:

**"UNDERSTOOD AND AGREED BY EMPLOYEE:**

"I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS AGREEMENT, THAT I UNDERSTAND ITS TERMS, THAT ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN THE COMPANY AND ME RELATING TO THE SUBJECTS COVERED IN THE AGREEMENT ARE CONTAINED IN IT, AND THAT I HAVE ENTERED INTO THE AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY PROMISES OR REPRESENTATIONS BY THE COMPANY OTHER THAN THOSE CONTAINED IN THIS AGREEMENT ITSELF."

Underneath the foregoing, the arbitration agreement has spaces for the employee to sign, date, and print his, her, or their name, and, at the bottom, the form is presigned by the Association's executive vice president, chief people and community officer.

The two employee handbook exhibits attached to Lambert's declaration reference arbitration as well. The 2018 team member handbook provided: "[The Association] has an arbitration program to ensure the rapid resolution of [t]eam [m]ember disputes. If you and [the Association] are not able to resolve any disputes that arise in connection with your employment, then you and [the Association] will arbitrate such disputes in accordance with the terms and conditions of the [a]rbitration [a]greement provided to you at the beginning of, or during, your [Association] employment. It is a condition of [Association] employment that all [t]eam [m]embers must accept the terms and conditions of the [a]rbitration [a]greement. If you have any questions about the [Association's] arbitration program or the [a]rbitration [a]greement, please feel free to discuss them with [the Association's] counsel or your own attorney."

The 2020 team member handbook provided: "MWG has an arbitration program to ensure the rapid resolution of disputes. If you and MWG are not able to resolve any disputes that arise in connection with your employment, then you and MWG will arbitrate such disputes in accordance with the terms and conditions of the [a]rbitration [a]greement provided to you at the beginning of, or during, your employment with MWG. It is a condition of employment with MWG that all [t]eam [m]embers must accept the terms and conditions of the [a]rbitration [a]greement, except where prohibited by state law. If you have any questions about the MWG arbitration program or the [a]rbitration [a]greement, please feel free to discuss them with your own attorney." The record does not explain what the acronym MWG stands for but the bottom of the document states the document is the Association's team member handbook.

Hasty opposed the petition and filed a declaration in support of her opposition. Hasty declared there was no mention of an arbitration agreement during her interview or

7

when she accepted the verbal employment offer. Hasty received an e-mail from the Association stating, "Greetings! Please sign into your [Association] [c]areers account and click on 'pending tasks' in order to view and acknowledge your offer letter. We look forward to having you on the team!" The e-mail also included a hyperlink to the written employment offer. In 2019, Hasty did not own a personal computer or tablet and relied exclusively on her smartphone for Internet access. Although the written employment offer indicated Hasty would sign an arbitration agreement on the first day of her employment, Hasty declared she did not physically or electronically sign an arbitration agreement on the first day.

Hasty attached to her declaration an e-mail she received from an employee at the Association, which provided: "We have all of your new hire forms and hire-related activities ready for you in our [n]ew [h]ire [o]nboarding [p]ortal. Please login, preferably before your first day, and complete the tasks listed." The e-mail contained a link, "Click here to access new hire forms," and username and password instructions. The e-mail stated to "move through each task listed" and noted that a red asterisk indicated a required field.

The trial court held an evidentiary hearing on the petition. Lambert testified at the hearing. She authenticated various documents and testified arbitration was a mandatory condition of employment at the Association in 2019 and every employee had to sign an arbitration agreement in order to be employed by the Association. Lambert confirmed Hasty had to agree to the arbitration provision in order to work for the Association.

Leslie Dazzi, the director of the Association's human resources information systems, testified she created an exhibit "to re-create what onboarding, specifically around the arbitration agreement, would look like from an iPhone." That exhibit is printed on a letter-size page. It appears that the arbitration agreement was accessed through an employee portal with a list of tasks to be completed as a new employee. It states "Item 11" is titled "Arbitration Agreement." On the purported arbitration

8

agreement page, there is a red box with the acronym "PDF" to the left of the words "Arbitration Agreement" in blue to its right. Underneath there are "Instructions" for "Consent to Electronic Signatures on Employment Records." The instructions provide: "I understand that my employer has offered the convenience of electronic signatures for the purpose of indicating my agreement to various employment agreements proposed to me from time to time during my employment. [¶] I understand that for any agreement to be conducted by electronic means, and for which I am able to sign by electronic signature, for my own record keeping [*sic*] purposes of any proposed agreement, and any final agreement: [¶] [Bullet point] I will be able to store an electronic copy, and [¶] [Bullet point] I will have access to a printer for printing a paper copy. [¶] I understand that upon my request I can always obtain from my employer a copy of any agreement I have signed with the [c]ompany, whether I signed a paper document or by electronic signature. [¶] I hereby voluntarily consent to, and authorize, the use of electronic means for conducting transactions between me and the [c]ompany, including electronic signatures to indicate agreement to any agreements between me and the [c]ompany."

Under the foregoing instructions is a "Signature Statement," under which there is an "I Agree" checkbox. The "Signature Statement" provides: "BY SIGNING THIS DOCUMENT ELECTRONICALLY, I ACKNOWLEDGE THAT I RECEIVED, READ, UNDERSTAND AND ACCEPT THE PROVISIONS OF THIS DOCUMENT." There is also a "Comment" box and then an option to "Submit" or "Save for Later."

After a brief recess, the trial court addressed two issues it was "concerned about," explaining: "The little check box that says I agree and then submit. When does the actual arbitration agreement come up? Does she have an opportunity to review the arbitration agreement before she checks I agree? . . . So I want to know what the sequence is of what Ms. Hasty would see on an iPhone. [¶] And then number two, do you have a screen shot of what the arbitration agreement would look like on an iPhone?" The trial court explained the Association introduced an exhibit that showed the arbitration

9

agreement on standard letter-size paper but it wanted to know "what it would look like on an iPhone, also which version did Ms. Hasty have, there are different versions of iPhones, what size, those things are the issues that [the court was] concerned about."

In response, Dazzi clarified that an employee using a phone would have to click on a link to open the arbitration agreement and then "after you have read that arbitration agreement and the instructions and the signature statement is when you would then want to either agree and submit." She testified that when she simulated what an employee would see on an iPhone, she was able to read the text of the arbitration agreement. She acknowledged, however, that she did not know what version of phone Hasty used when she accessed the employment documents.

The trial court asked Dazzi, "Ms. Hasty could check I agree without necessarily checking the icon for arbitration agreement; is that correct?" Dazzi responded, "That is correct." The trial court clarified, "So she could check consent. Whether or not she checks -- she clicks on the icon to the arbitration agreement is optional on her part; is that correct?" Dazzi replied, "That is correct." Dazzi also answered in the affirmative when asked whether she believed Hasty would have been able to read every word in the arbitration agreement, if she had opened it on her phone. Dazzi explained that she used a team member's iPhone to conduct the simulation as to what Hasty might have seen when she agreed to the arbitration agreement but she did not know what version of phone Hasty had at the time she reviewed the documents. She confirmed that even if an employee hits the "I agree" button, the system cannot tell whether the employee read the agreement.

Hasty testified that, in 2019, she had an iPhone 6, "the smaller one with the smaller screen." She "signed the paperwork that was sent to [her] after [she] verbally accepted an offer of employment. [She] had already put in [her] two weeks' notice at [her] previous employer. [She] was moving forward with [the Association]." Hasty explained, "I had accepted the job offer, and I needed to work, so obviously, I signed

10

paperwork so that I could work. That doesn't mean that I signed arbitration paperwork knowingly."

The trial court issued a very detailed order denying the Association's petition to compel arbitration. The trial court found that, although the Association established there was a valid arbitration agreement between the parties, the arbitration agreement was unconscionable. The trial court explained: "First, this [c]ourt concludes there is a high degree of procedural unconscionability based on the adhesive nature of the [a]rbitration [a]greement, the significant degree of prolix and hidden terms, undefined terms, and the questionability of [Hasty's] assent to arbitration. Second, this [c]ourt concludes that there are at least three terms that cause the [a]rbitration [a]greement to be substantively unconscionable. First, the [a]rbitration [a]greement is one-sided, and lacks the mutuality required under California [l]aw. Second, the confidentiality provision is overly broad and therefore unconscionable. Third, the waiver of [Hasty's] representative" Private Attorneys General Act of 2004 (Act) "claim is not valid. Although when, as here, the procedural unconscionability is high, this in turn requires less evidence of substantive unconscionability to render the arbitration provision unenforceable, this [c]ourt finds that with three overly harsh or overly one-sided, employer-imposed terms, the [a]rbitration [a]greement has far more than a low degree of substantive unconscionability. This [c]ourt finds that [Hasty] has established the [a]rbitration [a]greement is unconscionable and therefore unenforceable."

The trial court further declined to exercise its discretion to sever the unconscionable terms in the arbitration agreement "[b]ecause there are multiple unconscionable terms in the [a]rbitration [a]greement, [and] to remove the unconscionable taint, th[e] [c]ourt would [have] need[ed] to reform the [a]rbitration [a]greement." The Association appeals.

11

"An agreement to submit disputes to arbitration 'is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract.' " (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125 (*OTO*).) " ' "[G]enerally applicable contract defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements without contravening" the [Federal Arbitration Act]' or California law." (*Ibid.*) "A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party. [Citation.] Under this standard, the unconscionability doctrine ' "has both a procedural and a substantive element." ' " (*Ibid.*)

"Procedural unconscionability 'addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power.' [Citation.] 'Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided.' [Citation.] Both elements must be present for a court to refuse to enforce an arbitration agreement. [Citation.] However, the elements do not need to be present in the same degree and are evaluated on a ' " 'sliding scale.' " ' [Citation.] ' " '[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' " ' [Citation.] 'The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement.' " (*Magno v. The College Network, Inc.* (2016) 1 Cal.App.5th 277, 284-285.)

"The determination of arbitrability is a legal question subject to de novo review. [Citation.] We will uphold the trial court's resolution of disputed facts if supported by substantial evidence. [Citation.] Where, however, there is no disputed extrinsic evidence considered by the trial court, we will review its arbitrability decision de novo."

(*Nyulassy v. Lockheed Martin Corp.* (2004) 120 Cal.App.4th 1267, 1277.)  The party resisting arbitration, here Hasty, bears the burden of proving unconscionability. (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development* (*US*)*, LLC* (2012) 55 Cal.4th 223, 247.)

The Association argues the trial court erred in finding both procedural and substantive unconscionability and abused its discretion in refusing to sever the unconscionable terms.  We disagree.

Initially, we disregard any argument presented by the Association that Hasty improperly and untimely raised the issue of unconscionability in the trial court and that she thus forfeited her unconscionability arguments.  The Association did not present the argument under a proper heading.  (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 ["Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading"].)  We further note the Association's opening brief focuses on the trial court's findings and why the Association believes the trial court was mistaken in its reasoning and analysis.  We do not address the Association's assertions that the trial court erred in its reasoning and analysis because, as explained *ante*, we review the application of the law to the facts de novo.  (*Nyulassy v. Lockheed Martin Corp.*, *supra*, 120 Cal.App.4th at p. 1277; see *Kahan v. City of Richmond* (2019) 35 Cal.App.5th 721, 730 [under de novo review, appellate courts review the trial court's ruling, "not its reasoning or rationale"].)

As a final preliminary matter, we deny Hasty's request for judicial notice and motion to take additional evidence of another confidentiality agreement.  Hasty has neither established that she was unable to submit that confidentiality agreement into evidence in the trial court or that there are any exceptional circumstances supporting her request.

13

I

*The Arbitration Agreement Has Elements Of Procedural Unconscionability*

"Procedural unconscionability pertains to the making of the agreement and requires oppression or surprise.  [Citations.]  ' " 'Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form.' " ' " (*Magno v. The College Network, Inc.*, *supra*, 1 Cal.App.5th at p. 285.)  " '[T]here are degrees of procedural unconscionability.  At one end of the spectrum are contracts that have been freely negotiated by roughly equal parties, in which there is no procedural unconscionability. . . .  Contracts of adhesion that involve surprise or other sharp practices lie on the other end of the spectrum.' " (*Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1244.)

"The California Supreme Court has consistently stated that ' "[t]he procedural element of an unconscionable contract generally takes the form of a contract of adhesion . . . ." ' " (*Walnut Producers of California v. Diamond Foods, Inc.* (2010) 187 Cal.App.4th 634, 646.)  The unconscionability analysis, therefore, "begins with an inquiry into whether the contract is one of adhesion" and a finding of a contract of adhesion is essentially a finding of procedural unconscionability.  (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113.)  "An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power 'on a take-it-or-leave-it basis.' " (*OTO*, *supra*, 8 Cal.5th at p. 126.)

We conclude the arbitration agreement was a contract of adhesion, and the Association does not argue otherwise.  It is undisputed that Hasty's consent to the arbitration agreement was imposed as a condition of employment.  The arbitration agreement was a standard form that used the general reference "employee" and was presented to Hasty, an individual, on a take-it-or-leave-it basis by the Association, an

14

insurance company, who had superior bargaining power. (*OTO*, *supra*, 8 Cal.5th at p. 126 ["Arbitration contracts imposed as a condition of employment are typically adhesive"].) Indeed, Lambert testified and declared that every potential employee was required to sign the arbitration agreement to be employed by the Association. But there was no mention of an arbitration agreement during Hasty's interview or when she accepted the verbal employment offer, and Hasty left her prior employment after receiving the verbal offer of employment and then signed whatever documents she needed to sign to secure her employment with the Association. "[I]n the case of preemployment arbitration contracts, the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement." (*Armendariz v. Foundation Health Psychcare Services, Inc.*, *supra*, 24 Cal.4th at p. 115.) There is no evidence that Hasty was among the most sought-after employees. Hasty has thus shown the arbitration agreement was an adhesion contract and we turn to the element of oppression.

" 'The circumstances relevant to establishing oppression include, but are not limited to (1) the amount of time the party is given to consider the proposed contract; (2) the amount and type of pressure exerted on the party to sign the proposed contract; (3) the length of the proposed contract and the length and complexity of the challenged provision; (4) the education and experience of the party; and (5) whether the party's review of the proposed contract was aided by an attorney.' " (*OTO*, *supra*, 8 Cal.5th at pp. 126-127.)

Like the trial court, we do not find an "appreciable degree of oppression beyond that inherent in an adhesive employment agreement." Hasty received the e-mail with the link to the new hire forms on February 27, 2019, and was asked to "complete the tasks listed" "preferably before your first day," which was March 4, 2019. There is no

15

evidence to suggest that Hasty lacked the education or experience to review employment paperwork; she had previously been employed at other insurance agencies and there was no question she could read and understand English. We understand Hasty's argument that "[n]o one mentioned Workday or an arbitration agreement during her in-person interview or on the phone call in which the recruiter offered [her] the job," but that argument goes to surprise, not oppression.

Turning to the element of surprise, "surprise" occurs where the arbitration agreement is "written in an extremely small font" with " 'visually impenetrable' " paragraphs "filled with statutory references and legal jargon." (*OTO*, *supra*, 8 Cal.5th at p. 128.) It may further be shown when "the agreement appears to have been drafted with an aim to thwart, rather than promote, understanding," thereby undermining the non-drafting party's informed consent. (*Id*. at p. 129.)

The Association argues there was no surprise because (1) the formatting (i.e., font size, spacing, and placement) of the arbitration agreement was appropriate; (2) the presentation of the hyperlink to the arbitration agreement lessened any indicia of surprise; (3) the instructions on the signature page were not ambiguous; and (4) the inclusion of statutory references lessened any surprise.

Although we do not know the exact typeface and font size used, the font size does appear smaller than average[2] and the paragraphs are dense, spanning two single-spaced, letter-size pages filled with statutory references and legal jargon. (See *OTO*, *supra*, 8 Cal.5th at p. 128 [considering as a factor of surprise that the "sentences are complex, filled with statutory references and legal jargon"].) The Association gave Hasty one

---

[2]    The Association asserts the arbitration agreement "is printed in standard sized, approximately 11[-]point font," but there is no evidence to that effect in the record. Hasty in contrast argues the "mobile printout of the [a]rbitration [a]greement revealed that the font was smaller" and, by her calculation, was printed in 8.5-point font.

option to review and sign the arbitration agreement—she had to sign it electronically, even though her offer letter stated that she would review and sign the arbitration agreement on her first day of employment. Nothing in the record indicates the Association inquired into whether Hasty had the ability to view the documents electronically and did not appear to provide any other alternative, such as to view the documents at an office on a computer or to pick up the physical documents for review before signature. While the agreement permitted Hasty to retrieve signed documents, there was no direction on how to retrieve documents for review before signature, especially in light of the Association's insistence that Hasty sign the agreement before her first day of work. It is undisputed that Hasty did not have a computer when she electronically signed her employment paperwork and that she viewed the documents, including the arbitration agreement, on her phone, which had a small screen. Although Dazzi testified she was able to read the text of the arbitration agreement on another employee's iPhone, she acknowledged she did not know what phone Hasty had at the time she viewed the employment documents.

The Association asserts the trial court noted that Hasty "may have been able to adjust the size, or zoom of the document on the screen of the iPhone 6 she used." But the trial court did not make an affirmative factual finding that she *could have* adjusted the font or zoomed in, or that Hasty knew how to perform such tasks; it found only that she "may have been able to" do so and the Association cites to no *evidence* in the record that Hasty could have or knew how to perform such tasks.

We agree with the trial court's assessment that "the font and the density of the text" in the arbitration agreement was "exacerbated by the limited access to the [a]rbitration [a]greement on the [v]iew in the Workday [i]nbox of the [a]rbitration [a]greement [t]ask." Dazzi testified an employee would need to click on the red icon at the top of the screen with the language "Arbitration Agreement" next to it in order to access the document. Yet nothing on the electronic signature page indicated to or

17

advised the employee to do so, nor did the page indicate that there was a hyperlink; and the employee was not required to view the document before clicking "I Agree" at the bottom of the page. Additionally, the only consent information provided to the employee on the electronic signature page prior to clicking "I Agree" pertained to agreeing to electronically sign "various employment agreements proposed to me from time to time during my employment." We agree with the trial court that the term "this document" (capitalization omitted) in the signature statement—"BY SIGNING THIS DOCUMENT ELECTRONICALLY, I ACKNOWLEDGE THAT I RECEIVED, READ, UNDERSTAND AND ACCEPT THE PROVISIONS OF THIS DOCUMENT"—is ambiguous. As the trial court explained: "Neither the [i]nstructions nor the [s]ignature [s]tatement explicitly refer to the [a]rbitration [a]greement. Instead, the [i]nstructions refer to the 'Consent to Electronic Signatures on Employment Records.' And, the [s]ignature [s]tatement does not define what 'this document' actually is."

Taken together, we conclude the arbitration agreement was presented with the aim to thwart, rather than promote the nondrafting party's understanding and "[t]he document itself and the manner of its presentation did not promote voluntary or informed agreement to its terms." (*OTO*, *supra*, 8 Cal.5th at p. 129.)

In total, we conclude Hasty has established a high degree of procedural unconscionability. Having found procedural unconscionability, we next scrutinize the substantive terms of the arbitration provision. (*Baltazar v. Forever 21, Inc.*, *supra*, 62 Cal.4th at p. 1244 [" '[A] finding of procedural unconscionability does not mean that a contract will not be enforced, but rather that courts will scrutinize the substantive terms of the contract to ensure they are not manifestly unfair or one-sided' "].) Because of the high degree of procedural unconscionability, "a relatively low degree of substantive unconscionability may suffice to render the agreement unenforceable." (*OTO*, *supra*, 8 Cal.5th at p. 130.)

## II

### *The Arbitration Agreement Was Substantively Unconscionable*

"Substantive unconscionability examines the fairness of a contract's terms." (*OTO*, *supra*, 8 Cal.5th at p. 129.)  The substantive element of the unconscionability analysis "looks to the actual terms of the parties' agreement to 'ensure[] that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as " ' "overly harsh" ' " [citation], " 'unduly oppressive' " [citation], " 'so one-sided as to "shock the conscience" ' " [citation], or "unfairly one-sided." ' [Citation.] These formulations 'all mean the same thing.' [Citation.]  Substantive unconscionability ' "is concerned not with 'a simple old-fashioned bad bargain' [citation], but with terms that are 'unreasonably favorable to the more powerful party.' " ' [Citation.]  'The substantive component of unconscionability looks to whether the contract allocates the risks of the bargain in an objectively unreasonable or unexpected manner.'  [Citation.] While private arbitration may resolve disputes faster and cheaper than judicial proceedings, it ' "may also become an instrument of injustice imposed on a 'take it or leave it' basis." '  [Citation.]  ' "The courts must distinguish the former from the latter, to ensure that private arbitration systems resolve disputes not only with speed and economy but also with fairness." ' " (*Magno v. The College Network, Inc.*, *supra*, 1 Cal.App.5th at pp. 287-288.)

" '[T]he paramount consideration in assessing [substantive] unconscionability is mutuality.' " (*Nyulassy v. Lockheed Martin Corp.*, *supra*, 120 Cal.App.4th at p. 1281.) An arbitration agreement requires a " 'modicum of bilaterality,' " meaning the drafter cannot require another to submit to arbitration to pursue a claim but not accept the same limitation when it would act as the plaintiff, "without at least some reasonable justification for such one-sidedness based on 'business realities.' " (*Armendariz v. Foundation Health Psychcare Services, Inc.*, *supra*, 24 Cal.4th at p. 117.)  "When only the weaker party's claims are subject to arbitration, and there is no reasonable

justification for that lack of symmetry, the agreement lacks the requisite degree of mutuality. [Citations.] As our [Supreme Court] recognized in *Armendariz*, 'an arbitration agreement imposed in an adhesive context lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence or series of transactions or occurrences.' [Citation.] As the court also recognized, 'lack of mutuality can be manifested as much by what the agreement does not provide as by what it does.' " (*Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 657.)

We agree with the Association that the scope of the claims delineated to be brought in arbitration as to "disputes, claims, or causes of action, in law or equity, arising from or relating to [e]mployee's employment or the termination of [e]mployee's employment" is not one-sided. Although the arbitration agreement identifies certain statutes and claims that would ordinarily be used by an employee against an employer, "[t]he illustrative list of claims subject to the agreement is just that; the agreement specifically states that such claims 'includ[ing, without limitation]' the enumerated claims, thus making clear that the list is not intended to be exhaustive. It thus casts no doubt on the comprehensive reach of the arbitration agreement. It is not particularly remarkable that the agreement's list of examples might highlight certain types of claims that employees often bring, since part of the purpose of the agreement is to put employees such as [Hasty] on notice regarding the scope of the agreement, thus eliminating any possible surprise. The examples do not alter the substantive scope of the agreement, nor do they render the agreement sufficiently unfair as to make its enforcement unconscionable." (*Baltazar v. Forever 21, Inc.*, *supra*, 62 Cal.4th at p. 1249.)

That said, the arbitration agreement also provides that either party may file a charge or complaint with an appropriate governmental administrative agency, however, "the parties waive their right to any remedy or relief as a result of such charges or complaints brought by such governmental administrative agencies." That provision has

nothing to do with *arbitration*. Rather, it is simply a waiver of the right to compensation or relief in the administrative context, which certainly seems one-sided. Government administrative agencies after all generally oversee and enforce statutes and regulations against *employers* to protect employees.

For example, the Labor Commissioner may investigate employee complaints and may award to an employee "wages, penalties, and other demands for compensation, including liquidated damages." (Lab. Code, § 98, subd. (a).) A provision waiving the "right to any remedy or relief" as a result of a complaint brought by the Labor Commissioner, hidden in an arbitration agreement, insulates the Association from such awards and precludes the employee from obtaining redress for labor violations that a government agency has determined exist and are well-founded. Moreover, under Labor Code "sections 218.5, subdivision (a) (claim for nonpayment of wages), 1194, subdivision (a) (minimum wage claim), and 2802, subdivisions (b) and (c) (unpaid business expenses), a prevailing employee may recover his or her costs as a prevailing party." (*Mills v. Facility Solutions Group, Inc.* (2022) 84 Cal.App.5th 1035, 1053.) A waiver of administrative remedies and relief, hidden in an arbitration agreement, is overly harsh and shocks the conscience.

Additionally, we note the provision allowing the parties to file "a charge or complaint with appropriate governmental administrative agencies" appears to be inconsistent with the statement that the parties waived the right to resolve "any claim . . . by administrative proceeding" (boldface omitted). The terms of the arbitration agreement in that regard are confusing.

Furthermore, although not addressed by the parties, we note the hyperlink to the "JAMS [e]mployment [a]rbitration [r]ules and [p]rocedures" in the arbitration agreement does not lead to a page with arbitration rules or procedures, and there is no evidence in the record to suggest that it ever worked. The link leads to a webpage stating, "Page Not

21

Found" (last accessed October 26, 2023).[3] Even if the hyperlink worked when Hasty signed the agreement, however, the arbitration agreement nonetheless provides that arbitration shall be conducted "in accordance with the applicable employment rules of JAMS then in effect." It is unclear how an employee would know what terms he, she, or they were agreeing to at the time of signing the agreement when the rules and procedures may be different when a dispute arises in the future.

The confidentiality clause is also problematic. The arbitration agreement provides that "any and all disputes, claims, or causes of action, in law or equity, arising from or relating to [e]mployee's employment or the termination of [e]mployee's employment, including but not limited to statutory, contractual and other claims . . . shall be *resolved* to the fullest extent permitted by law, by final, binding, and confidential arbitration." (Italics added.) The trial court found the confidentiality clause was "overly broad" and thus unconscionable because the employee "is essentially barred from conducting informal discovery," which increases discovery costs, and it hampers an employee's " 'ability to prove a pattern of discrimination or to take advantage of findings in past arbitration[s].' " (Quoting *Ramos v. Superior Court* (2018) 28 Cal.App.5th 1042, 1066.)

The Association argues the confidentiality provision is not unconscionable because: (1) the agreement "limits the scope of the confidentiality clause to the 'extent permitted by law' "; (2) "the scope of the confidentiality clause is committed to the sound discretion of the arbitrator [and] the law presumes that the arbitrator will apply the confidentiality provision in a manner that conforms with California law"; (3) "the court's stated concern regarding confidentiality clauses applies to *other* arbitration agreements,

---

**3** We disregard the JAMS employment arbitration rules and procedures attached to the Association's motion for judicial notice because the Association's motion was denied. We further note that the Association used a different hyperlink in the motion than the one provided in the arbitration agreement.

22

which Hasty has no standing to challenge"; (4) even without the provision, Hasty "would still be unable to access the confidential materials in other arbitrations" and "[s]he would be in the exact same position as a litigant in court"; and (5) the trial court's finding that the language was ambiguous as to Hasty's ability to conduct informal discovery was erroneous because any ambiguity must "be construed in a manner that *avoids* invalidating an otherwise lawful agreement."[4]  We find no merit in the Association's arguments.

Our Supreme Court has held a confidentiality provision in an arbitration agreement is not per se unconscionable when it is based on *a legitimate commercial need* (such as to protect trade secrets or proprietary information).  (*Baltazar v. Forever 21, Inc.*, *supra*, 62 Cal.4th at p. 1250.)  The Association has, however, identified no commercial need for requiring employment-related proceedings to remain confidential. It cites two cases for the holding that a confidentiality provision is not unconscionable because it is not unreasonable or prejudicial to maintain secrecy between parties to the agreement.  (Citing *Sanchez v. Carmax Auto Superstores California, LLC* (2014) 224 Cal.App.4th 398, *Woodside Homes of California, Inc. v. Superior Court* (2003) 107 Cal.App.4th 723.)  Those cases do not support the Association's position.

In *Murrey*, the Fourth District Court of Appeal explained that *Sanchez* and *Woodside* are not persuasive "in the context of a workplace sexual harassment complaint."  (*Murrey v. Superior Court* (2023) 87 Cal.App.5th 1223, 1254.)  In *Murrey*, the employee signed an agreement stating that "she would not 'publish or disseminate' the arbitration award."  (*Id.* at pp. 1253-1254.)  The court found the confidentiality provision was substantively unconscionable because it "serve[d] no purpose other than to benefit [the employer].  Future employees cannot take advantage of findings in past arbitrations or prove a pattern of discrimination and/or retaliation. . . .  In addition,

---

**4**    We disregard any citations to documents accompanying the Association's motion for judicial notice because that motion was denied.

23

'keeping past findings secret undermines an employee's confidence in the fairness and honesty of the arbitration process and thus potentially discourages that employee from pursuing a valid discrimination claim.' " (*Id*. at p. 1255.) The same principles are at play here. Indeed, Lambert declared and testified that the Association's employees had to sign the arbitration agreement as a condition of employment.

Like the *Murrey* court, we conclude the confidentiality clause in the arbitration agreement benefits only the Association with respect to harassment, retaliation, and discrimination claims, such as the claims here, and is thus substantively unconscionable. The fact that the provision applies to only the "extent permitted by law" does not save it because the employee would have no way of knowing what would be covered or not covered by this provision. Nor does the assertion that Hasty has no standing to challenge other employees' arbitration agreements have any bearing on the question presented. Further, as explained *ante*, we do not address the Association's challenges to the trial court's reading of the confidentiality provision because of the de novo standard of review in this appeal.

Finally, the arbitration agreement is further one-sided because it requires the parties to bring their claims "in an individual capacity," not "in a private attorney general capacity," and prohibits class, representative, or private attorney general proceedings. These requirements can fairly be read to limit only the employee's rights. (See *Navas v. Fresh Venture Foods, LLC* (2022) 85 Cal.App.5th 626, 636 [arbitration agreement's prohibition of class or collective action was one-sided and harsh because "these are the type of claims that *only* employees bring against employers"].) For purposes of our analysis, it is irrelevant that Hasty has not brought a private attorney general action. (*Najarro v. Superior Court* (2021) 70 Cal.App.5th 871, 882-883.)

The requirement that an employee's claims be brought solely in an individual capacity and not "in a private attorney general capacity" precludes the employee from bringing a claim under the Act in arbitration or in court. But, as our Supreme Court

explained, an employee's right to bring a claim under the Act is not waivable. (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 383, overruled on other grounds in *Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. ___ [213 L.Ed.2d 179, 199-200].)  The Association relies on *Viking River Cruises, Inc.* for the proposition that the arbitration agreement can be read to require "Hasty to arbitrate her individual [Act] claims."  But, by the clear language of the agreement, an employee may not bring a claim "in a private attorney general capacity," either as an individual or as a nonindividual.  *Viking River Cruises, Inc.* dealt with whether an employer could require an employee to bring Act claims in arbitration, when the employee brings such claims in his, her, or their individual "representative" capacity under the Act.  (*Viking River Cruises, Inc.*, at pp. 199-200.)  The United States Supreme Court did not consider whether a complete ban on Act claims is unconscionable.

In *Adolph*, decided after *Viking River Cruises, Inc.*, our Supreme Court held that, although an employee may be compelled to arbitrate claims under the Act "that are 'premised on Labor Code violations actually sustained by' the plaintiff," the plaintiff "maintains statutory standing to pursue '[Act] claims arising out of events involving other employees' [citation] in court." (*Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104, 1114.)  The ban on *all* representative Act actions thus remains unconscionable because it requires an employee to waive a right that is not waivable.  (*Iskanian v. CLS Transportation Los Angeles, LLC*, *supra*, 59 Cal.4th at p. 383, overruled on other grounds in *Viking River Cruises, Inc. v. Moriana*, *supra*, 596 U.S. ___ [213 L.Ed.2d at pp. 199-200]; *Mills v. Facility Solutions Group, Inc.*, *supra*, 84 Cal.App.5th at p. 1062 ["*Iskanian*'s holding that waivers of [Act] claims are unenforceable as against public policy remains good law following *Viking River*"].)

On a sliding scale, the procedural and substantive unconscionability as to this arbitration agreement is high.  We next turn to the question of severance.

25

*The Trial Court Did Not Abuse Its Discretion In Declining To Sever Provisions*

Civil Code section 1670.5, subdivision (a) provides that "[i]f the court as a matter of law finds [a] contract or any clause of the contract to have been unconscionable at the time it was made[,] the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." " ' "In deciding whether to sever terms rather than to preclude enforcement of the provision altogether, the overarching inquiry is whether the interests of justice would be furthered by severance; the strong preference is to sever *unless* the agreement is 'permeated' by unconscionability." . . . An agreement to arbitrate is considered "permeated" by unconscionability where it contains more than one unconscionable provision.' " (*De Leon v. Pinnacle Property Management Services, LLC* (2021) 72 Cal.App.5th 476, 492.)

In *Armendariz*, our Supreme Court stated that Civil Code section 1670.5, subdivision (a) "appears to give a trial court some discretion as to whether to sever or restrict the unconscionable provision or whether to refuse to enforce the entire agreement. But it also appears to contemplate the latter course only when an agreement is 'permeated' by unconscionability." (*Armendariz v. Foundation Health Psychcare Services, Inc.*, *supra*, 24 Cal.4th at p. 122.) The court proceeded to analyze "the question of when a trial court abuses its discretion by refusing to enforce an entire agreement." (*Ibid.*) And it concluded that severance was inappropriate in that case in part because there were "multiple unlawful provisions," meaning "the trial court did not abuse its discretion in concluding that the arbitration agreement [wa]s permeated by an unlawful purpose." (*Id.* at p. 124.)

The trial court here declined to sever the unconscionable provisions because it found "at least three substantively unconscionable terms in the [a]rbitration [a]greement that defined the scope and terms of arbitration, and they appeared in multiple locations in

26

the [a]rbitration [a]greement." The court found that, "To remove the unconscionable taint, [it] would [have] need[ed] to reform the [a]rbitration [a]greement."

The Association argues the trial court abused its discretion in declining to sever the unconscionable provisions because the trial court "focus[ed] exclusively on the supposed one-sided nature of the [a]greement's scope to support its claim that reformation of the contract would be required, the trial court honed in on the single provision that, if indeed unconscionable, could not easily be extirpated from the [a]greement. The other two provisions the trial court found unconscionable—the confidentiality clause and the representative action waiver—are wholly collateral to the main purpose of the Agreement and are easily severable by simply striking the offending provisions."

We find no abuse of discretion and, in fact, agree with the trial court that the arbitration agreement is permeated with unconscionability, and the trial court could not simply sever the offending provisions. Rather, the trial court would have needed to rewrite the arbitration agreement, creating a new agreement to which the parties never agreed. "Moreover, upholding this type of agreement with multiple unconscionable terms [in addition to the high level of procedural unconscionability] would create an incentive for an employer to draft a one-sided arbitration agreement in the hope employees would not challenge the unlawful provisions, but if they do, the court would simply modify the agreement to include the bilateral terms the employer should have included in the first place." (*Mills v. Facility Solutions Group, Inc.*, *supra*, 84 Cal.App.5th at p. 1045.) We decline to do that.

" ' "[T]he overarching inquiry is whether the interests of justice would be furthered by severance" ' " and the answer to that question is, "no." (*De Leon v. Pinnacle Property Management Services, LLC*, *supra*, 72 Cal.App.5th at p. 492.)

27

## DISPOSITION

The order denying the Association's petition is affirmed. Hasty shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)-(b).)

/s/
ROBIE, Acting P. J.

We concur:

/s/
MAURO, J.

/s/
KRAUSE, J.

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----


| ALJARICE HASTY, | C097674 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CV-UWT-2021-0010217) |
| v. | |
| AMERICAN AUTOMOBILE ASSOCIATION OF NORTHERN CALIFORNIA, NEVADA & UTAH, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Joaquin County, Jayne C. Lee, Judge. Affirmed.

SV Employment Law Firm, Steven L. Friedlander and Carl J. Kaplan for Defendant and Appellant.

Renne Public Law Group, Jonathan V. Holtzman, Ryan P. McGinley-Stempel, Imran M. Dar and Michael S. Cohen for Plaintiff and Respondent.

1

THE COURT:

The opinion in the above-entitled matter filed on December 21, 2023, was not certified for publication in the Official Reports.  For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.


BY THE COURT:


 /s/ 
ROBIE, Acting P. J.



 /s/ 
MAURO, J.



 /s/ 
KRAUSE, J.

2